## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **ROCKSTAR CONSORTIUM US LP AND NETSTAR TECHNOLOGIES LLC,** | § § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **Civil Action No. 2:13-cv-00893-JRG-RSP** |
| **GOOGLE INC.** | § § | **JURY TRIAL DEMANDED** |
| *Defendant.* | § § | |

### DEFENDANT GOOGLE INC.'S ANSWER TO PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT

Defendant Google Inc. ("Google") answers the Complaint of Plaintiffs Rockstar Consortium US LP ("Rockstar") and NetStar Technologies LLC's ("NetStar") (collectively, "Plaintiffs") as follows:

### NATURE OF THE ACTION

1.      Google admits that Plaintiffs purports to bring an action for alleged patent infringement.

### THE PARTIES

2.      Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2, and therefore denies them.

3.      Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3, and therefore denies them.

4.      Google admits that Google Inc. is a Delaware corporation with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

5.      Google admits that Nortel Networks conducted an auction for a patent portfolio that included the Patents-in-Suit in July 2011.

6.      Google admits that it placed a bid at the auction in July 2011.

7.      Google admits that it was aware of the Patents-in-Suit at the time of the auction.

8.      Google admits that it first placed a bid of $900,000,000 for the Nortel patent portfolio.  Google further admits that it placed additional bids and that the winning bid at the auction was $4.5 billion.  Google denies that it bid $4.4 billion on its own.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 8 of the Complaint, and therefore denies them.

9.      Google denies the allegations in paragraph 9 of the Complaint, and specifically denies that it has committed any acts of infringement.

## JURISDICTION AND VENUE

10.     Google admits that this action invokes the United States patent laws, and that this Court has subject matter jurisdiction over patent law claims.  Google admits that venue is proper in the Eastern District of Texas for purposes of this particular action but not convenient or in the interests of justice under 28 U.S.C. 1404(a).  Google denies the remaining allegations of paragraph 10 of the Complaint.

## PLAINTIFFS' INFRINGEMENT ALLEGATIONS

### U.S. Patent No. 6,098,065

11.     Google admits that what appears to be a copy of United  States Patent No. 6,098,065 ("the '065 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '065 Patent is entitled "Associative Search Engine" and bears an issue date of August 1, 2000.  Google denies that the '065 Patent was duly and legally issued.  Google is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 11 of the Complaint, and therefore denies them.

12.     Google denies the allegations in paragraph 12 of the Complaint, and specifically denies that it has committed any acts of infringement.

13.     Google denies the allegations in paragraph 13 of the Complaint, and specifically denies that it has committed any acts of infringement.

### U.S. Patent No. 7,236,969

14.     Google admits that what appears to be a copy of United  States Patent No. 7,236,969 ("the '969 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '969 Patent is entitled "Associative Search Engine" and bears an issue date of June 26, 2007.  Google denies that the '178 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13 of the Complaint, and therefore denies them.

15.     Google denies the allegations in paragraph 15 of the Complaint, and specifically denies that it has committed any acts of infringement.

16.     Google denies the allegations in paragraph 16 of the Complaint, and specifically denies that it has committed any acts of infringement.

### U.S. Patent No. 7,469,245

17.     Google admits that what appears to be a copy of United  States Patent No. 7,469,245 ("the '245 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '245 Patent is entitled "Associative Search Engine" and bears an issue date of December 23, 2008.  Google denies that the '245 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 17 of the Complaint, and therefore denies them.

18.     Google denies the allegations in paragraph 18 of the Complaint, and specifically denies that it has committed any acts of infringement.

19.     Google denies the allegations in paragraph 19 of the Complaint, and specifically denies that it has committed any acts of infringement.

### U.S. Patent No. 7,672,970

20.     Google admits that what appears to be a copy of United  States Patent No. 7,672,970 ("the '970 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '970 Patent is entitled "Associative Search Engine" and bears an issue date of March 2, 2010.  Google denies that the '970 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 20 of the Complaint, and therefore denies them.

21.     Google denies the allegations in paragraph 21 of the Complaint, and specifically denies that it has committed any acts of infringement.

22.     Google denies the allegations in paragraph 22 of the Complaint, and specifically denies that it has committed any acts of infringement.

### U.S. Patent No. 7,895,178

23.     Google admits that what appears to be a copy of United  States Patent No. 7,895,178 ("the '178 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '178 Patent is entitled "Associative Search Engine" and bears an issue date of February 22, 2011.  Google denies that the '178 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 23 of the Complaint, and therefore denies them.

24.     Google denies the allegations in paragraph 24 of the Complaint, and specifically denies that it has committed any acts of infringement.

25.     Google denies the allegations in paragraph 25 of the Complaint, and specifically denies that it has committed any acts of infringement.

## U.S. Patent No. 7,895,183

26.     Google admits that what appears to be a copy of United  States Patent No. 7,895,183 ("the '183 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '183 Patent is entitled "Associative Search Engine" and bears an issue date of February 22, 2011.  Google denies that the '183 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 26 of the Complaint, and therefore denies them.

27.     Google denies the allegations in paragraph 27 of the Complaint, and specifically denies that it has committed any acts of infringement.

28.     Google denies the allegations in paragraph 28 of the Complaint, and specifically denies that it has committed any acts of infringement.

## U.S. Patent No. 7,933,883

29.     Google admits that what appears to be a copy of United  States Patent No. 7,933,883 ("the '883 Patent") is attached as an exhibit to Plaintiffs' Complaint and that, on its face, the '883 Patent is entitled "Associative Search Engine" and bears an issue date of April 26, 2011.  Google denies that the '883 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 28 of the Complaint, and therefore denies them.

30.     Google denies the allegations in paragraph 30 of the Complaint, and specifically denies that it has committed any acts of infringement.

31.     Google denies the allegations in paragraph 31 of the Complaint, and specifically denies that it has committed any acts of infringement.

## PLAINTIFFS' ALLEGATION OF WILLFUL INFRINGEMENT

32.     Google denies the allegations in paragraph 32 of the Complaint.

33.     Google denies the allegations in paragraph 33 of the Complaint.

## PLAINTIFFS' JURY DEMAND

34.     Plaintiffs' demand for a trial by jury for all issues triable to a jury does not state

any allegation, and Google is not required to respond.  To the extent that any allegations are

included in the demand, Google denies these allegations.

## PRAYER FOR RELIEF

35.     These paragraphs set forth the statement of relief requested by Plaintiffs to which

no response is required.  Google denies that Plaintiffs are entitled to any of the requested relief

and denies any allegations.

## AFFIRMATIVE DEFENSES

36.     Subject to the responses above, Google alleges and asserts the following defenses

in response to the allegations, undertaking the burden of proof only as to those defenses deemed

affirmative defenses by law, regardless of how such defenses are denominated herein.  In

addition to the affirmative defenses described below, subject to its responses above, Google

specifically reserves all rights to allege additional affirmative defenses that become known

through the course of discovery.

## FIRST DEFENSE – NON-INFRINGEMENT

37.     Google does not infringe and has not infringed (not directly, contributorily, or by

inducement), either literally or under the doctrine of equivalents, and is not liable for

infringement of any valid and enforceable claim of the '065, '969, '245, '970, '178, '183, or '883

Patents (collectively, the "Patents-in-Suit").

## SECOND DEFENSE - INVALIDITY

38.     The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. §

101 because the claims are directed to abstract ideas or other non-statutory subject matter.

39.     The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C.

§§ 102 because the claims lack novelty, and are taught and suggested by the prior art.

40.     The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C.

§§ 103 because the claims are obvious in view of the prior art.

41.     The claims of the Patents-in-Suit are invalid and unenforceable for failure satisfy

the conditions set forth in 35 U.S.C. § 112, including failure of written description, lack of

enablement, and claim indefiniteness.

## THIRD DEFENSE – LIMITATIONS ON PATENT DAMAGES

42.     Plaintiffs' claim for damages, if any, against Google for alleged infringement of

the Patents-in-Suit are limited by 35 U.S.C. §§ 286, 287, and/or 288.

## FOURTH DEFENSE – PROSECUTION HISTORY ESTOPPEL

43.     By reason of statements, representations, concessions, admissions, arguments,

and/or amendments, whether explicit or implicit, made by or on behalf of the applicants during

the prosecution of the patent applications that led to the issuance of the Patents-in-Suit,

Plaintiffs' claims of patent infringement are barred in whole or in part by the doctrine of

prosecution history estoppel.

## FIFTH DEFENSE - ESTOPPEL

44.     On information and belief, Plaintiffs' claims are barred, in whole or in part, by the

doctrines of estoppel, laches, disclaimer, patent misuse, and/or waiver.

**SIXTH DEFENSE – PATENT UNENFORCEABILITY (INEQUITABLE CONDUCT)**

45.     The '969 Patent issued on June 26, 2007.  It resulted from U.S. Patent Application No. 09/351,747 ("'747 Application"), filed on July 8, 1999.  The '969 Patent claims priority to then-pending U.S. Patent Application No. 08/798,747, which became the '065 Patent.

46.     The '245 Patent issued on December 23, 2008.  It resulted from U.S. Patent Application No. 11/767,650 ("'650 Application"), filed on June 25, 2007.  The '247 Patent claims priority to both the '969 Patent and the '065 Patent.

47.     The '970 Patent issued on March 2, 2010.  It resulted from U.S. Patent Application No. 11/767,569 ("'569 Application"), filed on June 25, 2007.  The '970 Patent claims priority to both the '969 Patent and '065 Patent.

48.     The '178 Patent issued on February 22, 2011.  It resulted from U.S. Patent Application No. 11/767,584 ("'584 Application"), filed June 25, 2007.  The '178 Patent claims priority to both the '969 Patent and '065 Patent.

49.     The '183 Patent issued on February 22, 2011.  It resulted from U.S. Patent Application No. 11/767,563 ("'563 Application"), filed June 25, 2007.  The '183 Patent claims priority to both the '969 Patent and '065 Patent.

50.     The '883 Patent issued on April 26, 2011.  It resulted from U.S. Patent Application No. 11/767,632 ("'632 Application"), filed June 25, 2007.  The '883 Patent claims priority to both the '969 Patent and '065 Patent.

51.     On information and belief, the '969 Patent, '245 Patent, '970 Patent, '178 Patent, '183 Patent, and '883 Patent (collectively "Child Patents") are unenforceable due to the commission of inequitable conduct and violation of the provisions of 37 C.F.R. 1.56 in procuring the Child Patents by the named inventors, the prosecuting attorney, and/or other persons owing a duty of candor to the PTO.

A.      **Inequitable Conduct During the Prosecution of the '969 Patent**

      1.      **Failure to Disclose PR News Article or the Barrett Patent in an Information Disclosure Statement During Prosecution of the '969 Patent**

52.      The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '969 Patent.

53.      The application that would become the '065 Patent originally contained 10 claims. Originally filed claims 1-6 of the application that would become the '065 Patent are identical to claims 1-6 of the '969 Patent.  For instance, originally filed independent claim 1 of the application that would become the '065 Patent and independent claim 1 of the '969 Patent both recite "A method of providing advertisements to a user searching for desired information within a data network, comprising the steps of: receiving, from the user, a search request including a search argument corresponding to the desired information; searching, based upon the received search argument, a first database having data network related information to generate search results; correlating the received search argument to a particular advertisement in a second database having advertisement related information; and providing the search results together with the particular advertisement to the user."  Like their counterparts in the '969 Patent, originally filed claims 2-6 of the application that would become the '065 Patent depend from claim 1.

54.      Similarly, originally filed independent claim 9 of the application that would become the '065 Patent is identical to independent claim 7 of the '969 Patent, reciting "A system for providing advertisements to a user searching for desired information within a data network, comprising: means for receiving, from the user a search request including a search argument

corresponding to the desired information; means for searching, based upon the received search

argument, a first database having data network related information to generate search results;

means for correlating the received search argument to a particular advertisement in a second

database having advertisement related information; and means for providing the search results

together with the particular advertisement to the user."

55.     The Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected originally filed

claims 1 and 9 as anticipated by "Web Crawler, Lycos, or Infoseek as disclosed by PR NEWS

('Make Sure Search Engines Find Your Site; options include buying words, advertising, and

careful page design'- PR NEWS)."  More specifically, the Examiner found that "Pr News taught

the 'Buying of words' in a search engine in which if that word correlated to a search query for

the search engine's web page database, the user would be presented with a specific advertiser's

banner (line 14-37) from a second database."  (December 21, 1998 Office Action at 2.)

56.     The Examiner of the '065 Patent also rejected claims 2-6 as obvious in light of PR

News in view of U.S. Patent No. 5,727,129 to Barrett.  More specifically, the Examiner found

that Barrett "[d]isclosed the use of user profiles for use in returning relevant hits" and that "[i]t

would have been obvious for one of ordinary skill in the art of computers to have included a user

profile in the search engines disclosed by PR NEWS in order to reduce the search time to return

relevant hits," rendering claim 2 obvious.  The Examiner similarly found that "[a]s to claim 3,

Barrett et al. disclosed previously received search arguments," "[a]s to claim 4, Barrett et al.

taught using the results from previous search sessions," "[a]s to claim 5, Barrett et al. taught that

user specified preferences as reflected in the user choice," and "[a]s to claim 6, PR NEWS taught

banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

57.     In response, the applicants canceled originally filed claims 1-6 and claim 9—which would later become claims 1-7 of the '969 Patent—and proceeded with originally filed claim 8, which is the only claim the Examiner allowed.  (March 19, 1999 Amendment at 1.)  The '065 Patent accordingly issued with one claim: originally filed claim 8, which was written in independent form to become claim 1 of the '065 Patent.  (April 8, 1999 Notice of Allowability at 1.)

58.     After canceling originally filed claims 1-6 and claim 9 of the application that would later become the '065 Patent, the applicants resubmitted those same claims in the '747 Application.  Those claims were later issued, unaltered, as claims 1-7 of the '969 Patent.

59.     Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News article and the Barrett patent, was not the Examiner of the '969 Patent.

60.     Under the broadest reasonable interpretation standard used by the PTO, the search engines described in the PR News article render claim 1 of the '969 Patent invalid under 35 U.S.C. § 102(a).  The PR News article discloses all elements of claim 1:

| 1.  A method of providing advertisements to a user searching for desired information within a data network, comprising the steps of: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites"  *Id*. at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
| --- | --- |
| receiving, from the user, a search request including a search argument corresponding to the desired information; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| searching, based upon the received search argument, a first database having data | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or |

| | |
|---|---|
| network related information to generate search results; | 'robots' to index the Web.  These programs automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it"<br><br>*Id*. at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| correlating the received search argument to a particular advertisement in a second database having advertisement related information; and | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
| providing the search results together with the particular advertisement to the user. | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results. |

| | |
|---|---|
| | Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |

(*See generally* PR News at 1.)  As detailed above, the Examiner of the '065 Patent similarly

found that identical claims in the application that would become the '065 Patent were anticipated

by the disclosures in the PR News article.  The Applicants never traversed these rejections.

61.     Under the broadest reasonable interpretation standard used by the PTO, the PR

News article in light of the Barrett patent anticipate and/or render obvious claims 2-6 of the '969

Patent.  The claims and the corresponding disclosure in PR News and/or Barrett, as found by the

Examiner, are listed below:

| | |
|---|---|
| 2. A method as claimed in claim 1, wherein the step of correlating the received search argument to the particular advertisement including selecting the particular advertisement based on the received search argument and user profile data. | Barrett at 5:15-46: "The system comprises: a local node having a user interface program thereon, for  allowing a user to interface with the network and request a download of information items from the information resources;<br>a network interface coupled between the local node and the network;<br>a user interface including (i) means for receiving user commends representative of user actions and (ii) means for displaying received network responses of network information for viewing by a user;<br>means for recording a sequence of successive user actions and network responses; |

| | means for developing a profile of user activities based on the user actions and network responses monitored in the step of monitoring; and<br>means for actively facilitating user activities based on the developed profile.<br><br>Since different users have different interests (utilize different browser features regularly or frequently, make different use of printer facilities, tend to view different sorts of Web information resources, etc.), the invention provides a user interface which is customized for a particular user, to reflect the user's interests.<br><br>The invention provides a layer of 'intelligence,' or active functionality, as distinct from the purely passive functionality provided by conventional browsers.<br><br>The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
|---|---|
| 3. A method as claimed in claim 2, wherein the user profile data includes selections of the user from previous search arguments. | Barrett at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| 4. A method as claimed in claim 3, wherein the user profile data includes selections of the user from previous search results. | Barrett at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that |

|  | the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
|---|---|
| 5. A method as claimed in claim 4, wherein the user profile data includes user specified preferences. | Barrett et al. taught user specified preferences as reflected in the user choices.<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| 6. A method as claimed in claim 1, wherein the step of providing the search results and the particular advertisement to the user includes displaying the search results as a page on a data processing device and the particular advertisement as an insert on the page. | PR NEWS taught banner advertisement inserts. *See, e.g.,* PR News at 1: "Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek.  Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period." |

62.    One or more of the named inventors of the '969 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '969 Patent, and were also aware that the PR News article and the Barrett patent were material to the patentability of the '969 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '969 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of

the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard

Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other

persons involved in the prosecution of the '969 Patent were aware of the materiality of the PR

News article and the Barrett patent because they had been cited by the Examiner as rendering

claims of the predecessor '065 Patent anticipated or obvious, and because the prosecution of the

'065 Patent had never traversed those rejections.  Indeed, the PR News article and the Barrett

patent had been cited in rejecting some of the <u>same</u> claims at issue in the '969 Patent.

63.     Despite its materiality to the application, the named inventors of the '969 Patent,

the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to

disclose the PR News article or the Barrett patent to the PTO as prior art in an Information

Disclosure Statement during the prosecution of the '969 Patent.  In fact, the named inventors of

the '969 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the

PTO did not disclose <u>any</u> prior art to the PTO.

64.     On information and belief, the failure to disclose the PR News article and the

Barrett patent during the prosecution of the '969 Patent was made knowingly and with intent to

deceive the PTO.

65.     Neither the PR News article nor the Barrett patent were independently discovered

by the Examiner of the '969 Patent, and neither appear on the "References Cited" of the '969

Patent.

66.     But for the failure of the applicants to disclose the PR News article or the Barrett

patent during the prosecution of the '969 Patent, at least claims 1-7 of the '969 Patent would not

have issued.  As detailed above, the Examiner of the '065 Patent found claims with identical

language in the application that would become the '065 Patent invalid in light of PR News and/or the Barrett patent.  The Applicants never traversed or even attempted to traverse those rejections.

67.     Furthermore, the Examiner of the '969 Patent allowed all claims in light of the applicant's arguments in their Reply brief to the BPAI.  (Notice of Allowability at 2.) Specifically, the applicants conceded that "receiving a search argument that included a keyword," "searching, based upon the search argument, a database that identified a plurality of web pages," and "[t]he searching operation identifying a plurality of web pages" are "conventional search engine operations in which search results are produced in response to a search argument," and did not dispute that those conventional search engine operations were disclosed in the first two limitations of what would become claims 1 and 7 of the '969 Patent. (June 6, 2005 Corrected Reply Brief at 7.)  However, the applicants argued that the prior art Sullivan reference disclosed "sale of a keyword" rather than "selling advertisements by the keyword" as disclosed in the '969 Patent.  (*Id*. at 7-8.)  Specifically, the applicants argued that "[w]ith the 'selling of advertisements by the keyword,' a search engine chooses advertisements based upon a sold keyword.  Alternatively, with the 'selling of keywords,' search results are ordered based upon a sold keyword."  (*Id*. at 8.)

68.     Yet the PR News article shows that at the time of the alleged invention, "search engines [chose] advertisements based upon a sold keyword," the very element the applicants asserted was missing from the Sullivan reference: "[a]dvertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links."  (PR News at 1; *see generally id*.)  This further shows that the '969 Patent would not have issued had the Examiner been aware of the PR News article.

69.     As a result of the actions described above, all claims of the '969 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '969 Patent.

### 2.     False Statements Regarding Open Text During Prosecution of the '969 Patent

70.     The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements with the intent to deceive the PTO during the prosecution of the '969 Patent.

71.     The '969 Examiner rejected all claims of the '969 Patent in light of the Sullivan reference's disclosure of the Open Text search engine.  In response, the applicants submitted Diagram 3, purporting to describe the operation of Open Text in 1996:



Diagram 3 - Keyword Selling as of 1996

(June 6, 2005 Corrected Reply Brief at 7.)  The applicants then argued that in the Open Text search engine, "the search results were ordered based upon the 'sold' keyword (Operation 4) and the search results were delivered to the search requester in the determined order (Operation 5).

These operations certainly do not disclose, teach, or suggest Elements C and D of claim 1," which the applicants stated require "correlating the received search argument to a particular advertisement in a second database having advertisement related information" and "providing the search results together with the particular advertisement to the user (Element D)."

72.     Contrary to the Applicants' statements to the BPAI, the Open Text search engine did <u>not</u> "order[] the web pages of the search results if the keyword had been 'sold' to the owner of one or more of the identified web pages."  Rather, the Open Text search engine maintained a separate database of advertisements which were correlated against potential keywords entered by users.  When receiving a query containing a correlated keyword, the Open Text search engine would retrieve both search results from its search index and advertisements from its advertisements database.  Both the ads and the search results would be presented to the user, with the ads being separately designated from the search results.  On information and belief, the ads were labeled "Preferred Listings" on the search results page to distinguish them from results from the search index.

73.     Additionally, the shared specification of the asserted patents repeatedly refers to the Open Text search engine as a "conventional search engine."  (*e.g.,* '969 Patent at 1:20-23, 2:19-21; 4:12-15.)  At least as of the prosecution of the '969 Patent, the Applicants were made aware that Open Text was not a "conventional search engine," and in fact contained similar if not identical advertising technology allegedly invented by the Applicants.  Yet at no point in the prosecution of any of the subsequent patents-at-issue did the Applicants seek to amend their incorrect statements regarding the Open Text search engine.

74.     On information and belief, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor to the PTO had actual knowledge regarding the

functionality of the Open Text search engine.  On information and belief, the Applicants' false statements regarding Open Text functionality were made knowingly and with intent to deceive the PTO.

75.     Alternately, on information and belief, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor to the PTO had no knowledge regarding the functionality of the Open Text search engine that they described to the PTO.  On information and belief, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor to the PTO knowingly made representations regarding the functionality of the Open Text search engine without any support, with the intent to convince the PTO of the veracity of those representations.

76.     But for the Applicants' false statements to the PTO regarding Open Text functionality, the claims of the '969 Patent would not have issued.  The Examiner had previously rejected all claims in light of the Open Text functionality described in the Sullivan reference. Directly after the Applicants' false description of the Open Text functionality, the Examiner granted all claims.  Moreover, the Examiner explicitly noted that he granted the claims in light of the Applicants' distinction between "selling advertisements by the keyword"—as described in the alleged invention—and "selling of keywords wherein search results ordered based upon a sold keyword"—as the applicants claimed was practiced by the Open Text search engine. (Notice of Allowability at 2.)  Had the Examiner known that the Open Text search engine in actuality "sold advertisements by the keyword," he would not have withdrawn his rejection and granted the claims.

77.     As a result of the actions described above, all claims of the '969 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '969 Patent.

3.  **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

78.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements with the intent to deceive the PTO during the prosecution of the '969 Patent.

79.    The '969 Examiner rejected all claims of the '969 Patent in light of the Sullivan reference's disclosure of the state of search engine art.  As the Examiner argued in his Responsive Brief to the BPAI:

> Search engines (then and now) were particularly used for such handling of advertisements. See, for instance, www.google.com's https://adwords.google.com/ select/advantages.html (attached to this Office Action).  This website is not given as prior art; rather, the website is given to illustrate a typical use of search engine (then and now). This gives a typical use of search engines (then and now): keywords of search arguments are used to correlate to the advertisement.  Thus, cited passages of Sullivan (as Sullivan directly mentions search engines in such fashion) would teach such 'correlating the search argument to particular advertisement' of the claimed invention.

(February 28, 2005 Office Action at 2.)  In response, the applicants asserted that correlating keywords to search advertisements was not the state of the art at the time of the claimed invention:

> Cited in the Office Action of February 28, 2005, is a web page dated February 20, 2005.  This article describes generally the history of Google, Inc., which was formally founded on September 7, 1998 (more than one year after the effective filing date of the pending application, February 13, 1997).  According to the Examiner, this reference is cited not as prior art but to "illustrate a typical use of search engine (then and now).  This gives a typical use of search engines (then and now)."  Office Action of February 28, 2005 at page 2.
>
> **Applicants respectfully disagree with this characterization of the state of the art as of the effective filing date of the present application.**  As stated in the cited article, "[i]n 2000, Google had begun selling advertisements by the keyword so that they would be more relevant to the end user."  Thus, not until 2000 did Google begin selling advertisements by the keyword, three years after the effective filing date of the present application.  A timeline for Google, located at the URL address: http://www.google.com/intl/en/corporate/timeline.html states

that not until 1998 was the Google search engine even in the beta stage, one year
after the effective filing date of the present application.

(June 6, 2005 Corrected Reply Brief at 8.)

80.    Contrary to the Applicants' statements to the BPAI, the Examiner was correct as

to the state of the art as of the effective filing date of the present application.  As disclosed in the

PR News article, many search engines at the time of effective filing offered "advertisement

banner links" that retrieved specific advertisements according to the keywords entered by a user.

PR News at 1: "[a]dvertisements that appear only with the results of a specific key word search

are a minimum of $1,000 for a four-week period.  WebCrawler, Lycos and Infoseek offer

advertisement banner links, however Alta Vista's product is still in beta-test."

81.    The PR News article was not only disclosed in the prosecution of the predecessor

'065 Patent, but used to reject some of the same claims at issue in the '969 Patent.  Accordingly,

the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor

to the PTO had constructive knowledge as to the contents of the PR News article.  On

information and belief, the named inventor(s), the prosecuting attorney(s), and/or other persons

owing a duty of candor to the PTO had actual knowledge of the PR News article as well.

82.    On information and belief, the Applicants' false statements as to the state of the

art as of the effective filing date of the '969 Patent was made knowingly and with intent to

deceive the PTO.

83.    But for the Applicants' false statements to the PTO regarding the state of the art,

the claims of the '969 Patent would not have issued.  The Examiner of the '065 Patent had

already rejected all claims in light of the Sullivan reference, which disclosed search engine

functionality as of the effective filing data of the '969 Patent.  After the Applicants' false

statements, the Examiner granted all claims of the '969 Patent explicitly premised on those same

false statements. (Notice of Allowability at 2.) Had the applicants not mislead the Examiner as to the status of the art, the Examiner would not have done so.

84.     As a result of the actions described above, all claims of the '969 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '969 Patent.

### 4.   <u>Failure to Disclose Kohda Article in an Information Disclosure Statement During Prosecution of the '969 Patent</u>

85.     The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '969 Patent.

86.     In May 1996, Youji Kohda and Sesumu Endo published an article entitled "Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the *Computer Networks and ISDN Systems* journal. (Vol. 28, issues 7-11, pp. 1493-1499.) The same article was also presented at the Fifth International World Wide Web Conference on May 9, 1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html. The Kohda article describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser." (Kohda 2.) Since "the agent is aware of the identity of the user and which page the user is about to read on the browser, [] the advertising agent can tailor advertisements for *individuals and their current interests*." (Kohda 4 (emphasis in original).)

87.     During the prosecution of the parent '065 Patent, the applicants informed the PTO of the Kohda article in a supplement to an earlier Information Disclosure Statement. (November 12, 1998 Fax at 7.)

88.     Despite being both aware of the Kohda article and considering it sufficiently material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants failed to inform the Examiner of the '969 Patent of the existence of the Kohda article.  In fact, the Applicants failed to submit any prior art at all.

89.     Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was submitted, was not the Examiner of the '969 Patent.

90.     Under the broadest reasonable interpretation standard used by the PTO, the agent system described in the Kohda article renders at least claim 1 of the '969 Patent invalid under 35 U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1.  A method of providing advertisements to a user searching for desired information within a data network, comprising the steps of: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."<br><br>*Id*. at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| receiving, from the user, a search request including a search argument corresponding to the desired information; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the |

| | advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
|---|---|
| searching, based upon the received search argument, a first database having data network related information to generate search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."

As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument." (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on <u>any</u> server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
| correlating the received search argument to a particular advertisement in a second database having advertisement related information; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| providing the search results together with the particular advertisement to the user. | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's |

| | Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
|---|---|

91.     One or more of the named inventors of the '969 Patent and others involved in the prosecution of the patent were aware of the existence of the Kohda article during the prosecution of the '969 Patent, and were also aware that the Kohda article was material to the patentability of the '969 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '969 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '969 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '969 Patent shares a specification.

92.     Despite its materiality to the application, the named inventors of the '969 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '969 Patent.  In fact, the named inventors of the '969 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO did not disclose any prior art to the PTO.

93.     On information and belief, the failure to disclose the Kohda article during the prosecution of the '969 Patent was made knowingly and with intent to deceive the PTO.

94.     The Kohda article was not independently discovered by the Examiner of the '969 Patent, and does not appear on the "References Cited" of the '969 Patent.

95.     But for the failure of the applicants to disclose the Kohda article during the

prosecution of the '969 Patent, at least claim 1 of the '969 Patent would not have issued.  Related

Patent Application No. 13/031,478 is in prosecution before the PTO.  The '478 Application

shares a specification with the '969 Patent, and both claim priority to the '065 Patent.  After the

Examiner indicated that the claims had been allowed, the Applicants—who are no longer

represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that

disclosed the Kohda article.  The Examiner subsequently withdrew the Notice of Acceptance and

found the majority of the pending claims of the '478 Application anticipated by Kohda.

(September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that a portion of

Section 2.2 of the Kohda article, excerpted above, disclosed claim elements similar to those

found in claim 1 of the '969 Patent.  Had the Examiner of the '969 Patent been aware of the

Kohda reference, he would have similarly found at least claim 1 invalid.

96.     As a result of the actions described above, all claims of the '969 Patent are

unenforceable due to inequitable conduct committed during the prosecution of the '969 Patent.

B.     **Inequitable Conduct During the Prosecution of the '245 Patent**

1.     **Failure to Disclose PR News Article and Barrett Patent in an Information Disclosure Statement During Prosecution of the '245 Patent**

97.     The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '245 Patent.

98.     As detailed above, the Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected

originally filed independent claims as anticipated by "Web Crawler, Lycos, or Infoseek as

disclosed by PR NEWS ('Make Sure Search Engines Find Your Site; options include buying

words, advertising, and careful page design'- PR NEWS)."  More specifically, Dr. Lintz found

that "Pr News taught the 'Buying of words' in a search engine in which if that word correlated to

a search query for the search engine's web page database, the user would be presented with a

specific advertiser's banner (line 14-37) from a second database."  (December 21, 1998 Office

Action at 2).

99.     The Examiner of the '065 Patent also found several originally filed dependent

claims as obvious in light of PR News in view of U.S. Patent in light of U.S. Patent No.

5,727,129 to Barrett.  More specifically, the Examiner found that Barrett "[d]isclosed the use of

user profiles for use in returning relevant hits" and that "[i]t would have been obvious for one of

ordinary skill in the art of computers to have included a user profile in the search engines

disclosed by PR NEWS in order to reduce the search time to return relevant hits."  The Examiner

similarly found that Barrett disclosed  "previously received search arguments," "using the results

from previous search sessions," "user specified preferences as reflected in the user choice," and

that Pr News "taught banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

100.    Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News

article and the Barrett patent, was not the Examiner of the '245 Patent.

101.    Under the broadest reasonable interpretation standard used by the PTO, the search

engines described in the PR News article in view of the Barrett reference render at least claim 1

of the '245 Patent invalid under 35 U.S.C. § 103.  The PR News article in view of Barrett

discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
|---|---|

| | |
|---|---|
| | *Id*. at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
| receiving user preference input from the data processing device via the communications link; | Barrett at 5:28-29: "means for recording a sequence of successive user actions and network responses."<br><br>*Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| creating user preference data based upon the user preference input; | Barrett at 5:30-32: "means for developing a profile of user activities based on the user actions and network responses monitored in the step of monitoring"<br><br>*Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| receiving from the data processing device via the communications link a search request that includes a search argument; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| searching at least one database using the search argument to produce search results; | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or 'robots' to index the Web.  These programs |

| | |
|---|---|
| | automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it"<br><br>*Id*. at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| selecting at least one advertisement from an advertisement database relating to the search argument using the user preference data; and | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek.<br>Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period.<br>WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test."<br><br>Barrett at 5:33-34: "means for actively facilitating user activities based on the developed profile"<br><br>*Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in |

| | |
|---|---|
| | Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device. | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |

Further, the '065 Examiner explicitly noted—and as the applicants never disputed—that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  (December 21, 1998 Office Action at 3.)

102.    One or more of the named inventors of the '245 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '245 Patent; and were also aware that this article and patent were material to the patentability of the '245 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons

involved in the prosecution of the '245 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '245 Patent were aware of the materiality of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious, and because the prosecutions of the prior patents in that patent family had never traversed those rejections.

103.    Despite its materiality to the application, the named inventors of the '245 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the PR News article and the Barrett patent to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '245 Patent.  In fact, the named inventors of the '245 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO did not disclose <u>any</u> prior art at all to the PTO.

104.    On information and belief, the failure to disclose the PR News article and the Barrett patent during the prosecution of the '245 Patent was made knowingly and with intent to deceive the PTO.

105.    Neither the PR News article nor the Barrett patent were independently discovered by the Examiner of the '245 Patent, and neither appear on the "References Cited" of the '245 Patent.

106.    But for the failure of the applicants to disclose the PR News article and the Barrett Patent during the prosecution of the '245 Patent, at least claim 1 of the '245 Patent would not have issued.  As detailed above, the Examiner of the '065 Patent found claim 2 of the application

that would become the '065 Patent—which contains very similar requirements as claim 1 of the '245 Patent—invalid in light of the PR News article and the Barrett patent. The Applicants never traversed or even attempted to traverse the rejection.

107. As a result of the actions described above, all claims of the '245 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '245 Patent.

2. **Failure to Correct False Statements Regarding Open Text Made During Prosecution of the Ancestor '969 Patent**

108. As detailed in ¶¶ 70 through 77 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding Open Text with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

109. At no point during the prosecution of the '245 Patent or its ancestor patents did the Applicants expressly advise the PTO of the existence of the false statements, stating specifically where they reside. Nor did the Applicants advise the PTO as to the actual facts regarding the functionality of the Open Text search engine. Nor did the Applicants take the necessary action openly, calling the Examiner's attention to the untrue or misleading assertions sought to be overcome. The Applicants' failure to cure the false statements made during the '969 Patent prosecution renders all claims of the '245 Patent unenforceable due to inequitable conduct.

3. **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

110. As detailed in ¶¶ 78 through 84 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding the state of the art with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

111.    At no point during the prosecution of the '245 Patent or its ancestor patents did the Applicants expressly advise the PTO of the existence of the false statements, stating specifically where they reside.  Nor did the Applicants advise the PTO as to the actual facts regarding the state of the art.  Nor did the Applicants take the necessary action openly, calling the Examiner's attention to the untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false statements made during the '969 Patent prosecution renders all claims of the '245 Patent unenforceable due to inequitable conduct.

4.    **Failure to Disclose Kohda Article in an Information Disclosure Statement During Prosecution of the '245 Patent**

112.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '245 Patent.

113.    In May 1996, Youji Kohda and Sesumu Endo published an article entitled "Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the *Computer Networks and ISDN Systems* journal.  (Vol. 28, issues 7-11, pp. 1493-1499.) The same article was also presented at the Fifth International World Wide Web Conference on May 9, 1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html.  The Kohda article describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser."  (Kohda 2.)  Since "the agent is aware of the identity of the user and which page the user is about to read on the browser, [] the advertising agent can tailor advertisements for *individuals and their current interests*."  (Kohda 4 (emphasis in original).)

114.    During the prosecution of the parent '065 Patent, the applicants informed the PTO

of the Kohda article in a supplement to an earlier Information Disclosure Statement.  (November

12, 1998 Fax at 7.)

115.    Despite being both aware of the Kohda article and considering it sufficiently

material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants

failed to inform the Examiner of the '245 Patent of the existence of the Kohda article.  In fact,

the Applicants failed to submit any prior art at all.

116.    Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was

submitted, was not the Examiner of the '245 Patent.

117.    Under the broadest reasonable interpretation standard used by the PTO, the agent

system described in the Kohda article renders at least claim 1 of the '245 Patent invalid under 35

U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste." *Id*. at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |

| | |
|---|---|
| receiving user preference input from the data processing device via the communications link; | Kohda 3: "Next, the advertising agent company also negotiates with users, who agree to see advertisements while browsing. This is similar to subscription procedure for technical magazines, which are full of technical articles and advertisements which target is the subscribers of the magazines. The agent company is responsible for delivering the appropriate advertisements to the users. Thus, the contract should at least allow the users to specify what categories of advertisements they wish to see. For example, a user can declare that he or she is interesting in new books, new personal computers, and used cars." |
| creating user preference data based upon the user preference input; | Kohda 3: "Next, the advertising agent company also negotiates with users, who agree to see advertisements while browsing. This is similar to subscription procedure for technical magazines, which are full of technical articles and advertisements which target is the subscribers of the magazines. The agent company is responsible for delivering the appropriate advertisements to the users. Thus, the contract should at least allow the users to specify what categories of advertisements they wish to see. For example, a user can declare that he or she is interesting in new books, new personal computers, and used cars." |
| receiving from the data processing device via the communications link a search request that includes a search argument; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| searching at least one database using the search argument to produce search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from |

| | ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."

As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument."  (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on <u>any</u> server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
|---|---|
| selecting at least one advertisement from an advertisement database relating to the search argument using the user preference data; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen.

Note that the agent is aware of the identity of the user and which page the user is about to read on the browser, so the advertising agent can tailor advertisements for *individuals and their current interests*. Thus it prevents the user from having to see advertisements that are unrelated to their current interests." |
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device. | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its |

|  | advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
|---|---|

118.     One or more of the named inventors of the '245 Patent and others involved in the prosecution of the patent were aware of the existence of the Kohda article during the prosecution of the '245 Patent, and were also aware that the Kohda article was material to the patentability of the '245 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '245 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '245 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '245 Patent shares a specification.

119.     Despite its materiality to the application, the named inventors of the '245 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '245 Patent.  In fact, the named inventors of the '245 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO did not disclose any prior art to the PTO.

120.     On information and belief, the failure to disclose the Kohda article during the prosecution of the '245 Patent was made knowingly and with intent to deceive the PTO.

121.     The Kohda article was not independently discovered by the Examiner of the '245 Patent, and does not appear on the "References Cited" of the '245 Patent.

122.   But for the failure of the applicants to disclose the Kohda article during the

prosecution of the '245 Patent, at least claim 1 of the '245 Patent would not have issued.  Related

Patent Application No. 13/031,478 is in prosecution before the PTO.  The '478 Application

shares a specification with the '245 Patent, and both claim priority to the '065 Patent.  After the

Examiner indicated that the claims had been allowed, the Applicants—who are no longer

represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that

disclosed the Kohda article.  The Examiner subsequently withdrew the Notice of Acceptance and

found the majority of the pending claims of the '478 Application anticipated by Kohda.

(September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that portions of

Sections 2.1 and 2.2 of the Kohda article, excerpted above, disclosed claim elements similar to

those found in claim 1 of the '245 Patent.  Had the Examiner of the '245 Patent been aware of

the Kohda reference, he would have similarly found at least claim 1 invalid.

123.   As a result of the actions described above, all claims of the '245 Patent are

unenforceable due to inequitable conduct committed during the prosecution of the '245 Patent.

C.   **Inequitable Conduct During the Prosecution of the '970 Patent**

1.   **Failure to Disclose PR News Article and Barrett Patent in an Information Disclosure Statement During Prosecution of the '970 Patent**

124.   The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '970 Patent.

125.   As detailed above, the Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected

originally filed independent claims as anticipated by "Web Crawler, Lycos, or Infoseek as

disclosed by PR NEWS ('Make Sure Search Engines Find Your Site; options include buying

words, advertising, and careful page design'- PR NEWS)."  More specifically, Dr. Lintz found

that "Pr News taught the 'Buying of words' in a search engine in which if that word correlated to

a search query for the search engine's web page database, the user would be presented with a

specific advertiser's banner (line 14-37) from a second database."  (December 21, 1998 Office

Action at 2).

126.   The Examiner of the '065 Patent also found several originally filed dependent

claims as obvious in light of PR News in view of U.S. Patent in light of U.S. Patent No.

5,727,129 to Barrett.  More specifically, the Examiner found that Barrett "[d]isclosed the use of

user profiles for use in returning relevant hits" and that "[i]t would have been obvious for one of

ordinary skill in the art of computers to have included a user profile in the search engines

disclosed by PR NEWS in order to reduce the search time to return relevant hits."  The Examiner

similarly found that Barrett disclosed  "previously received search arguments," "using the results

from previous search sessions," "user specified preferences as reflected in the user choice," and

that Pr News "taught banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

127.   Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News

article and the Barrett patent, was not the Examiner of the '970 Patent.

128.   Under the broadest reasonable interpretation standard used by the PTO, the search

engines described in the PR News article in view of the Barrett reference render at least claim 1

of the '970 Patent invalid under 35 U.S.C. § 103.  The PR News article in view of Barrett

discloses all elements of claim 1:

| 1. An advertising machine implemented on at least one computer and operable to provide advertisements via a communications link to a data processing device of a user, the advertising machine comprising: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
|---|---|

| | |
|---|---|
| | *Id.* at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
| a communications interface operable to interface with the data processing device of the user via the communications link; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| a database search engine operable to: receive from the data processing device via the communications link a search request that includes a search argument; and | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| search at least one database using the search argument to produce search results; | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or 'robots' to index the Web.  These programs automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it"<br><br>*Id.* at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| an associative search engine operable to select at least one advertisement from an advertisement database based upon at least one of the search argument and the search results; and | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek.<br>Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week |

| | period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
|---|---|
| the advertising machine operable to: transmit the search results together with the at least one advertisement via the communications link to the data processing device; | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines. For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results. Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results. Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
| receive a response from the data processing device via the communications link that indicates selection of an advertisement; and | Barrett at 5:28-29: "means for recording a sequence of successive user actions and network responses."<br><br>*Id.* at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR |

| | NEWS in order to reduce the search time to return relevant hits. |
|---|---|
| based upon the advertisement selection, generate a fee record. | It would have been obvious for one of ordinary skill in the art of computers to generate a fee record based upon an advertisement selection.  By the time of the alleged invention, many advertisers tied advertising spending to fee records so as to tie their banner advertisements to demonstrated user interest.  For instance, in 1996 Yahoo agreed to charge Procter & Gamble only in the event a user clicked on a P&G link. |

Further, the '065 Examiner explicitly noted—and as the applicants never disputed—that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  (December 21, 1998 Office Action at 3.)

129.    One or more of the named inventors of the '970 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '970 Patent; and were also aware that this article and patent ere material to the patentability of the '970 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the 970 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '970 Patent were aware of the materiality of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the

predecessor '065 Patent anticipated or obvious, and because the prosecutions of the prior patents

in that patent family had never traversed those rejections.

130.    Despite its materiality to the application, the named inventors of the '970 Patent,

the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to

disclose the PR News article and the Barrett patent to the PTO as prior art in an Information

Disclosure Statement during the prosecution of the '970 Patent.

131.    On information and belief, the failure to disclose the PR News article and the

Barrett patent during the prosecution of the '970 Patent was made knowingly and with intent to

deceive the PTO.  Indeed, the Examiner of the '970 Patent explicitly noted that while "the Office

is conducting further research into the prior art that can be used in the Office Action," it was

"greatly inhibited by the Office Actions being limited (for the most part) to documents."  (March

3, 2009 Office Action at 2-3)  Despite the Examiner's warning the applicants that "[n]either

Applicant nor the Office would gain from issuing a patent merely for overcoming MPEP

standard (of evidence being limited to documents) while fully knowing of invalidity of such a

patent" (*id*. at 3), the named inventors of the '970 Patent, the prosecuting attorney(s), and/or

other persons having a duty of candor to the PTO withheld the PR News article and the Barrett

patent from the Examiner.

132.    Neither the PR News article nor the Barrett patent were independently discovered

by the Examiner of the '970 Patent, and neither appear on the "References Cited" of the '970

Patent.

133.    But for the failure of the applicants to disclose the PR News article and the Barrett

Patent during the prosecution of the '970 Patent, at least claim 1 of the '970 Patent would not

have issued.  As detailed above, the Examiner of the '065 Patent found claim 1 of the application

that would become the '065 Patent—which contains very similar requirements as claim 1 of the '970 Patent—invalid in light of the PR News article.  The Applicants never traversed or even attempted to traverse the rejection.

134.    As a result of the actions described above, all claims of the '970 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '970 Patent.

2.    **Failure to Correct False Statements Regarding Open Text Made During Prosecution of the Ancestor '969 Patent**

135.    As detailed in ¶¶ 70 through 77 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding Open Text with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

136.    At no point during the prosecution of the '970 Patent or its ancestor patents did the Applicants expressly advise the PTO of the existence of the false statements, stating specifically where they reside.  Nor did the Applicants advise the PTO as to the actual facts regarding the functionality of the Open Text search engine.  Nor did the Applicants take the necessary action openly, calling the Examiner's attention to the untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false statements made during the '969 Patent prosecution renders all claims of the '970 Patent unenforceable due to inequitable conduct.

3.    **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

137.    As detailed in ¶¶ 78 through 84 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding the state of the art with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

138.     At no point during the prosecution of the '970 Patent did the Applicants expressly

advise the PTO of the existence of the false statements, stating specifically where they reside.

Nor did the Applicants advise the PTO as to the actual facts regarding the state of the art.  Nor

did the Applicants take the necessary action openly, calling the Examiner's attention to the

untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false

statements made during the '969 Patent prosecution renders all claims of the '970 Patent

unenforceable due to inequitable conduct.

4.     **Failure to Disclose Kohda Article in an Information Disclosure
Statement During Prosecution of the '970 Patent**

139.     The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '970 Patent.

140.     In May 1996, Youji Kohda and Sesumu Endo published an article entitled

"Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the

*Computer Networks and ISDN Systems* journal.  (Vol. 28, issues 7-11, pp. 1493-1499.) The same

article was also presented at the Fifth International World Wide Web Conference on May 9,

1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online

at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html.  The Kohda article

describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged

with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on

the users' Web browser."  (Kohda 2.)  Since "the agent is aware of the identity of the user and

which page the user is about to read on the browser, [] the advertising agent can tailor

advertisements for *individuals and their current interests*."  (Kohda 4 (emphasis in original).)

141.    During the prosecution of the parent '065 Patent, the applicants informed the PTO

of the Kohda article in a supplement to an earlier Information Disclosure Statement.  (November

12, 1998 Fax at 7.)

142.    Despite being both aware of the Kohda article and considering it sufficiently

material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants

failed to inform the Examiner of the '970 Patent of the existence of the Kohda article.

143.    Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was

submitted, was not the Examiner of the '970 Patent.

144.    Under the broadest reasonable interpretation standard used by the PTO, the agent

system described in the Kohda article renders at least claim 1 of the '970 Patent invalid under 35

U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1. An advertising machine implemented on at least one computer and operable to provide advertisements via a communications link to a data processing device of a user, the advertising machine comprising: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."<br><br>*Id*. at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |

| | |
|---|---|
| a communications interface operable to interface with the data processing device of the user via the communications link; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste." |
| a database search engine operable to: receive from the data processing device via the communications link a search request that includes a search argument; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| search at least one database using the search argument to produce search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste." <br><br> As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument." (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on <u>any</u> server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |

| | |
|---|---|
| an associative search engine operable to select at least one advertisement from an advertisement database based upon at least one of the search argument and the search results; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| the advertising machine operable to: transmit the search results together with the at least one advertisement via the communications link to the data processing device; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| receive a response from the data processing device via the communications link that indicates selection of an advertisement; and | Kohda 4: "Advertisements returned from the advertising agent's Web server can have links to other pages which might, for example, be more detailed advertisements or online order forms for the advertised goods or services. When users follow these links, the advertising agent can detect these actions: Who, when, to what page. The agent records the actions, and the accumulated record can be used by the agent to show the effectiveness of their services to the advertisers." |
| based upon the advertisement selection, generate a fee record. | Kohda 3: "Next, the advertising agent company also negotiates with users, who agree to see advertisements while browsing. This is similar to subscription procedure for technical magazines, which are full of technical articles and advertisements which target is the subscribers of the magazines. The agent company is responsible for delivering the appropriate advertisements to the users. Thus, the contract should at least allow the users to specify what categories of advertisements they wish to see. For example, a user can declare that he or she is interesting |

| | in new books, new personal computers, and used cars." |
|---|---|
| | *Id*. at 4: "Advertisements returned from the advertising agent's Web server can have links to other pages which might, for example, be more detailed advertisements or online order forms for the advertised goods or services. When users follow these links, the advertising agent can detect these actions: Who, when, to what page. The agent records the actions, and the accumulated record can be used by the agent to show the effectiveness of their services to the advertisers." |

145.    One or more of the named inventors of the '970 Patent and others involved in the prosecution of the patent were aware of the existence of the Kohda article during the prosecution of the '970 Patent, and were also aware that the Kohda article was material to the patentability of the '970 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '970 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '970 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '970 Patent shares a specification.

146.    Despite its materiality to the application, the named inventors of the '970 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '970 Patent.

147.    On information and belief, the failure to disclose the Kohda article during the

prosecution of the '970 Patent was made knowingly and with intent to deceive the PTO.

148.    The Kohda article was not independently discovered by the Examiner of the '970

Patent, and does not appear on the "References Cited" of the '970 Patent.

149.    But for the failure of the applicants to disclose the Kohda article during the

prosecution of the '970 Patent, at least claim 1 of the '970 Patent would not have issued.  Related

Patent Application No. 13/031,478 is in prosecution before the PTO.  The '478 Application

shares a specification with the '245 Patent, and both claim priority to the '065 Patent.  After the

Examiner indicated that the claims had been allowed, the Applicants—who are no longer

represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that

disclosed the Kohda article.  The Examiner subsequently withdrew the Notice of Acceptance and

found the majority of the pending claims of the '478 Application anticipated by Kohda.

(September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that portions of

Sections 2.1, 2.2, and 2.3 of the Kohda article, excerpted above, disclosed claim elements similar

to those found in claim 1 of the '970 Patent.  Had the Examiner of the '970 Patent been aware of

the Kohda reference, he would have similarly found at least claim 1 invalid.

150.    As a result of the actions described above, all claims of the '970 Patent are

unenforceable due to inequitable conduct committed during the prosecution of the '970 Patent.

D.    **Inequitable Conduct During the Prosecution of the '183 Patent**

1.    **Failure to Disclose PR News Article and Barrett Patent in an Information Disclosure Statement During Prosecution of the '183 Patent**

151.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '183 Patent.

152. As detailed above, the Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected originally filed independent claims as anticipated by "Web Crawler, Lycos, or Infoseek as disclosed by PR NEWS ('Make Sure Search Engines Find Your Site; options include buying words, advertising, and careful page design'- PR NEWS)."  More specifically, Dr. Lintz found that "Pr News taught the 'Buying of words' in a search engine in which if that word correlated to a search query for the search engine's web page database, the user would be presented with a specific advertiser's banner (line 14-37) from a second database."  (December 21, 1998 Office Action at 2).

153. The Examiner of the '065 Patent also found several originally filed dependent claims as obvious in light of PR News in view of U.S. Patent in light of U.S. Patent No. 5,727,129 to Barrett.  More specifically, the Examiner found that Barrett "[d]isclosed the use of user profiles for use in returning relevant hits" and that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  The Examiner similarly found that Barrett disclosed  "previously received search arguments," "using the results from previous search sessions," "user specified preferences as reflected in the user choice," and that Pr News "taught banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

154. Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News article and the Barrett patent, was not the Examiner of the '183 Patent.

155. Under the broadest reasonable interpretation standard used by the PTO, the search engines described in the PR News article in view of the Barrett reference render at least claim 1

of the '183 Patent invalid under 35 U.S.C. § 102.  The PR News article discloses all elements of

claim 1:

| | |
|---|---|
| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites"<br><br>*Id*. at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
| receiving from the data processing device via the communications link a search request that includes a search argument; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| searching at least one database using the search argument to produce search results; | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or 'robots' to index the Web.  These programs automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it"<br><br>*Id*. at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| selecting at least one advertisement from an advertisement database based upon at least one of the search argument and the search results; | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the |

| | |
|---|---|
| | Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
| and transmitting the search results together with the at least one advertisement via the communications link to the data processing device in a web page data format that causes the data processing device to display the search results in a first display portion of a display of the data processing device and to display the at least one advertisement in a second display portion of the display of the data processing device. | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines. For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results. Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results. Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |

Further, the '065 Examiner explicitly noted—and as the applicants never disputed—that "[i]t

would have been obvious for one of ordinary skill in the art of computers to have included a user

profile in the search engines disclosed by PR NEWS in order to reduce the search time to return

relevant hits."  (December 21, 1998 Office Action at 3.)

156.    One or more of the named inventors of the '183 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '183 Patent; and were also aware that this article and patent were material to the patentability of the '183 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '183 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '183 Patent were aware of the materiality of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious, and because the prosecutions of the prior patents in that patent family had never traversed those rejections.

157.    Despite its materiality to the application, the named inventors of the '183 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the PR News article and the Barrett patent to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '183 Patent.

158.    On information and belief, the failure to disclose the PR News article and the Barrett patent during the prosecution of the '183 Patent was made knowingly and with intent to deceive the PTO.

159.    Neither the PR News article nor the Barrett patent were independently discovered by the Examiner of the '183 Patent, and neither appear on the "References Cited" of the '183 Patent.

160.    But for the failure of the applicants to disclose the PR News article and the Barrett

Patent during the prosecution of the '183 Patent, at least claim 1 of the '183 Patent would not

have issued.  As detailed above, the Examiner of the '065 Patent found claim 1 of the application

that would become the '065 Patent—which contains very similar requirements as claim 1 of the

'183 Patent—invalid in light of the PR News article.  The Applicants never traversed or even

attempted to traverse the rejection.

161.    As a result of the actions described above, all claims of the '183 Patent are

unenforceable due to inequitable conduct committed during the prosecution of the '183 Patent.

2.    **Failure to Correct False Statements Regarding Open Text Made During Prosecution of the Ancestor '969 Patent**

162.    As detailed in ¶¶ 70 through 77 above, the named inventor(s), the prosecuting

attorney(s), and/or other persons owing a duty of candor made false statements regarding Open

Text with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

163.    At no point during the prosecution of the '183 Patent or its ancestor patents did

the Applicants expressly advise the PTO of the existence of the false statements, stating

specifically where they reside.  Nor did the Applicants advise the PTO as to the actual facts

regarding the functionality of the Open Text search engine.  Nor did the Applicants take the

necessary action openly, calling the Examiner's attention to the untrue or misleading assertions

sought to be overcome.  The Applicants' failure to cure the false statements made during the

'969 Patent prosecution renders all claims of the '183 Patent unenforceable due to inequitable

conduct.

3.    **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

164.    As detailed in ¶¶ 78 through 84 above, the named inventor(s), the prosecuting

attorney(s), and/or other persons owing a duty of candor made false statements regarding the

state of the art with the intent to deceive the PTO during the prosecution of the ancestor '969

Patent.

165.    At no point during the prosecution of the '183 Patent did the Applicants expressly

advise the PTO of the existence of the false statements, stating specifically where they reside.

Nor did the Applicants advise the PTO as to the actual facts regarding the state of the art.  Nor

did the Applicants take the necessary action openly, calling the Examiner's attention to the

untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false

statements made during the '969 Patent prosecution renders all claims of the '183 Patent

unenforceable due to inequitable conduct.

4.    **Failure to Disclose Kohda Article in an Information Disclosure
Statement During Prosecution of the '183 Patent**

166.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '183 Patent.

167.    In May 1996, Youji Kohda and Sesumu Endo published an article entitled

"Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the

*Computer Networks and ISDN Systems* journal.  (Vol. 28, issues 7-11, pp. 1493-1499.) The same

article was also presented at the Fifth International World Wide Web Conference on May 9,

1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online

at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html.  The Kohda article

describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged

with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on

the users' Web browser."  (Kohda 2.)  Since "the agent is aware of the identity of the user and

which page the user is about to read on the browser, [] the advertising agent can tailor advertisements for *individuals and their current interests*."  (Kohda 4 (emphasis in original).)

168.    During the prosecution of the parent '065 Patent, the applicants informed the PTO of the Kohda article in a supplement to an earlier Information Disclosure Statement.  (November 12, 1998 Fax at 7.)

169.    Despite being both aware of the Kohda article and considering it sufficiently material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants failed to inform the Examiner of the '183 Patent of the existence of the Kohda article.

170.    Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was submitted, was not the Examiner of the '183 Patent.

171.    Under the broadest reasonable interpretation standard used by the PTO, the agent system described in the Kohda article renders at least claim 1 of the '183 Patent invalid under 35 U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste." |
|---|---|
| | *Id*. at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges |

| | those returned Web pages, and displays a composite page on the screen." |
|---|---|
| receiving from the data processing device via the communications link a search request that includes a search argument; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| searching at least one database using the search argument to produce search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."<br><br>As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument." (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on any server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
| selecting at least one advertisement from an advertisement database based upon at least one of the search argument and the search results; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges |

| | those returned Web pages, and displays a composite page on the screen." |
|---|---|
| and transmitting the search results together with the at least one advertisement via the communications link to the data processing device in a web page data format that causes the data processing device to display the search results in a first display portion of a display of the data processing device and to display the at least one advertisement in a second display portion of the display of the data processing device. | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen."<br><br>*See also id.*, Figure 2:<br><br> |

172.    One or more of the named inventors of the '183 Patent and others involved in the prosecution of the patent were aware of the existence of the Kohda article during the prosecution of the '183 Patent, and were also aware that the Kohda article was material to the patentability of the '183 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '183 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E.

Garlick, and/or other persons involved in the prosecution of the '183 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '183 Patent shares a specification.

173.    Despite its materiality to the application, the named inventors of the '183 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '183 Patent.

174.    On information and belief, the failure to disclose the Kohda article during the prosecution of the '183 Patent was made knowingly and with intent to deceive the PTO.

175.    The Kohda article was not independently discovered by the Examiner of the '183 Patent, and does not appear on the "References Cited" of the '183 Patent.

176.    But for the failure of the applicants to disclose the Kohda article during the prosecution of the '183 Patent, at least claim 1 of the '183 Patent would not have issued.  Related Patent Application No. 13/031,478 is in prosecution before the PTO.  The '478 Application shares a specification with the '245 Patent, and both claim priority to the '065 Patent.  After the Examiner indicated that the claims had been allowed, the Applicants—who are no longer represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that disclosed the Kohda article.  The Examiner subsequently withdrew the Notice of Acceptance and found the majority of the pending claims of the '478 Application anticipated by Kohda. (September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that portions of Section 2.2 of the Kohda article, excerpted above, disclosed claim elements similar to those found in claim 1 of the '183 Patent.  Had the Examiner of the '183 Patent been aware of the Kohda reference, he would have similarly found at least claim 1 invalid.

177.    As a result of the actions described above, all claims of the '183 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '183 Patent.

E.    **Inequitable Conduct During the Prosecution of the '883 Patent**

1.    **Failure to Disclose PR News Article and Barrett Patent in an Information Disclosure Statement During Prosecution of the '883 Patent**

178.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '883 Patent.

179.    As detailed above, the Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected originally filed independent claims as anticipated by "Web Crawler, Lycos, or Infoseek as disclosed by PR NEWS ('Make Sure Search Engines Find Your Site; options include buying words, advertising, and careful page design'- PR NEWS)."  More specifically, Dr. Lintz found that "Pr News taught the 'Buying of words' in a search engine in which if that word correlated to a search query for the search engine's web page database, the user would be presented with a specific advertiser's banner (line 14-37) from a second database."  (December 21, 1998 Office Action at 2).

180.    The Examiner of the '065 Patent also found several originally filed dependent claims as obvious in light of PR News in view of U.S. Patent in light of U.S. Patent No. 5,727,129 to Barrett.  More specifically, the Examiner found that Barrett "[d]isclosed the use of user profiles for use in returning relevant hits" and that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  The Examiner similarly found that Barrett disclosed  "previously received search arguments," "using the results

from previous search sessions," "user specified preferences as reflected in the user choice," and that Pr News "taught banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

181.    Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News article and the Barrett patent, was not the Examiner of the '883 Patent.

182.    Under the broadest reasonable interpretation standard used by the PTO, the search engines described in the PR News article in view of the Barrett reference render at least claim 1 of the '883 Patent invalid under 35 U.S.C. § 103.  The PR News article in view of Barrett discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites"<br><br>*Id*. at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
|---|---|
| creating user profile data for the user; | Barrett at 5:28-29: "means for recording a sequence of successive user actions and network responses."<br><br>*Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| storing the user profile data; | Barrett at 5:30-32: "means for developing a profile of user activities based on the user actions and network responses monitored in the step of monitoring" |

| | |
|---|---|
| | *Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| receiving from the data processing device via the communications link a search request that includes a search argument; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| searching at least one database having data network related information using the search argument to generate search results; | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or 'robots' to index the Web.  These programs automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it"<br><br>*Id*. at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| selecting at least one advertisement from an advertisement database relating to the search argument using the user profile data; and | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek.<br>Depending on Impression and specific topic, |

| | advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
| | |
| | Barrett at 5:33-34: "means for actively facilitating user activities based on the developed profile" |
| | |
| | *Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities." |
| | |
| | It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device. | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. |

|  | WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
|---|---|

Further, the '065 Examiner explicitly noted—and as the applicants never disputed—that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits." (December 21, 1998 Office Action at 3.)

183.    One or more of the named inventors of the '883 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '883 Patent; and were also aware that this article and patent were material to the patentability of the '883 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '883 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '883 Patent were aware of the materiality of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious, and because the prosecutions of the prior patents in that patent family had never traversed those rejections.

184.    Despite its materiality to the application, the named inventors of the '883 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the PR News article and the Barrett patent to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '883 Patent.

185.    On information and belief, the failure to disclose the PR News article and the Barrett patent during the prosecution of the '883 Patent was made knowingly and with intent to deceive the PTO.

186.    Neither the PR News article nor the Barrett patent were independently discovered by the Examiner of the '183 Patent, and neither appear on the "References Cited" of the '883 Patent.

187.    But for the failure of the applicants to disclose the PR News article and the Barrett Patent during the prosecution of the '183 Patent, at least claim 1 of the '883 Patent would not have issued.  As detailed above, the Examiner of the '065 Patent found claim 2 of the application that would become the '065 Patent—which contains very similar requirements as claim 1 of the '883 Patent—invalid in light of the PR News article in view of Barrett.  The Applicants never traversed or even attempted to traverse the rejection.

188.    As a result of the actions described above, all claims of the '883 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '883 Patent.

2.    **Failure to Correct False Statements Regarding Open Text Made During Prosecution of the Ancestor '969 Patent**

189.    As detailed in ¶¶ 70 through 77 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding Open Text with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

190.    At no point during the prosecution of the '883 Patent or its ancestor patents did the Applicants expressly advise the PTO of the existence of the false statements, stating specifically where they reside.  Nor did the Applicants advise the PTO as to the actual facts regarding the functionality of the Open Text search engine.  Nor did the Applicants take the necessary action openly, calling the Examiner's attention to the untrue or misleading assertions

sought to be overcome.  The Applicants' failure to cure the false statements made during the

'969 Patent prosecution renders all claims of the '883 Patent unenforceable due to inequitable

conduct.

3.      **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

191.    As detailed in ¶¶ 78 through 84 above, the named inventor(s), the prosecuting

attorney(s), and/or other persons owing a duty of candor made false statements regarding the

state of the art with the intent to deceive the PTO during the prosecution of the ancestor '969

Patent.

192.    At no point during the prosecution of the '883 Patent did the Applicants expressly

advise the PTO of the existence of the false statements, stating specifically where they reside.

Nor did the Applicants advise the PTO as to the actual facts regarding the state of the art.  Nor

did the Applicants take the necessary action openly, calling the Examiner's attention to the

untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false

statements made during the '969 Patent prosecution renders all claims of the '883 Patent

unenforceable due to inequitable conduct.

4.      **Failure to Disclose Kohda Article in an Information Disclosure Statement During Prosecution of the '883 Patent**

193.    The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '883 Patent.

194.    In May 1996, Youji Kohda and Sesumu Endo published an article entitled

"Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the

*Computer Networks and ISDN Systems* journal.  (Vol. 28, issues 7-11, pp. 1493-1499.) The same

article was also presented at the Fifth International World Wide Web Conference on May 9, 1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html.  The Kohda article describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser."  (Kohda 2.)  Since "the agent is aware of the identity of the user and which page the user is about to read on the browser, [] the advertising agent can tailor advertisements for *individuals and their current interests*."  (Kohda 4 (emphasis in original).)

195.    During the prosecution of the parent '065 Patent, the applicants informed the PTO of the Kohda article in a supplement to an earlier Information Disclosure Statement.  (November 12, 1998 Fax at 7.)

196.    Despite being both aware of the Kohda article and considering it sufficiently material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants failed to inform the Examiner of the '883 Patent of the existence of the Kohda article.

197.    Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was submitted, was not the Examiner of the '883 Patent.

198.    Under the broadest reasonable interpretation standard used by the PTO, the agent system described in the Kohda article renders at least claim 1 of the '883 Patent invalid under 35 U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. |

| | Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste." |
|---|---|
| | *Id.* at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| creating user profile data for the user; | Kohda 3: "Next, the advertising agent company also negotiates with users, who agree to see advertisements while browsing. This is similar to subscription procedure for technical magazines, which are full of technical articles and advertisements which target is the subscribers of the magazines. The agent company is responsible for delivering the appropriate advertisements to the users. Thus, the contract should at least allow the users to specify what categories of advertisements they wish to see. For example, a user can declare that he or she is interesting in new books, new personal computers, and used cars." |
| storing the user profile data; | Kohda 3: "Next, the advertising agent company also negotiates with users, who agree to see advertisements while browsing. This is similar to subscription procedure for technical magazines, which are full of technical articles and advertisements which target is the subscribers of the magazines. The agent company is responsible for delivering the appropriate advertisements to the users. Thus, the contract should at least allow the users to specify what categories of advertisements they wish to see. For example, a user can declare that he or she is interesting in new books, new personal computers, and used cars." |

| | |
|---|---|
| receiving from the data processing device via the communications link a search request that includes a search argument; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| searching at least one database having data network related information using the search argument to generate search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."<br><br>As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument." (June 6, 2005 Correct Reply Brief at 7.) Since Kohda displays advertisements "on <u>any</u> server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
| selecting at least one advertisement from an advertisement database relating to the search argument using the user profile data; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen. |

|  | Note that the agent is aware of the identity of the user and which page the user is about to read on the browser, so the advertising agent can tailor advertisements for *individuals and their current interests*. Thus it prevents the user from having to see advertisements that are unrelated to their current interests" |
|---|---|
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device. | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |

199.    One or more of the named inventors of the '883 Patent and others involved in the prosecution of the patent were aware of the existence of the Kohda article during the prosecution of the '883 Patent, and were also aware that the Kohda article was material to the patentability of the '883 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '883 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '883 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '883 Patent shares a specification.

200.    Despite its materiality to the application, the named inventors of the '883 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to

disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '883 Patent.

201.    On information and belief, the failure to disclose the Kohda article during the prosecution of the '883 Patent was made knowingly and with intent to deceive the PTO.

202.    The Kohda article was not independently discovered by the Examiner of the '883 Patent, and does not appear on the "References Cited" of the '883 Patent.

203.    But for the failure of the applicants to disclose the Kohda article during the prosecution of the '883 Patent, at least claim 1 of the '883 Patent would not have issued.  Related Patent Application No. 13/031,478 is in prosecution before the PTO.  The '478 Application shares a specification with the '245 Patent, and both claim priority to the '065 Patent.  After the Examiner indicated that the claims had been allowed, the Applicants—who are no longer represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that disclosed the Kohda article.  The Examiner subsequently withdrew the Notice of Acceptance and found the majority of the pending claims of the '478 Application anticipated by Kohda. (September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that portions of Sections 2.1 and 2.2 of the Kohda article, excerpted above, disclosed claim elements similar to those found in claim 1 of the '883 Patent.  Had the Examiner of the '883 Patent been aware of the Kohda reference, he would have similarly found at least claim 1 invalid.

204.    As a result of the actions described above, all claims of the '883 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '883 Patent.

F.    **Inequitable Conduct During the Prosecution of the '178 Patent**

1.    **Failure to Disclose PR News Article and Barrett Patent in an Information Disclosure Statement During Prosecution of the '178 Patent**

205.   The named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor failed to disclose in an Information Disclosure Statement with the intent to deceive to the PTO material prior art in their possession, which they knew or should have known the PTO would consider material to the PTO's decision to grant the '178 Patent.

206.   As detailed above, the Examiner of the '065 Patent, Dr. Paul R. Lintz, rejected originally filed independent claims as anticipated by "Web Crawler, Lycos, or Infoseek as disclosed by PR NEWS ('Make Sure Search Engines Find Your Site; options include buying words, advertising, and careful page design'- PR NEWS)."  More specifically, Dr. Lintz found that "Pr News taught the 'Buying of words' in a search engine in which if that word correlated to a search query for the search engine's web page database, the user would be presented with a specific advertiser's banner (line 14-37) from a second database."  (December 21, 1998 Office Action at 2).

207.   The Examiner of the '065 Patent also found several originally filed dependent claims as obvious in light of PR News in view of U.S. Patent in light of U.S. Patent No. 5,727,129 to Barrett.  More specifically, the Examiner found that Barrett "[d]isclosed the use of user profiles for use in returning relevant hits" and that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  The Examiner similarly found that Barrett disclosed  "previously received search arguments," "using the results from previous search sessions," "user specified preferences as reflected in the user choice," and that Pr News "taught banner advertisement inserts."  (December 21, 1998 Office Action at 3.)

208.    Dr. Paul R. Lintz, the Examiner of the '065 Patent who had located the PR News

article and the Barrett patent, was not the Examiner of the '178 Patent.

209.    Under the broadest reasonable interpretation standard used by the PTO, the search

engines described in the PR News article in view of the Barrett reference render at least claim 1

of the '178 Patent invalid under 35 U.S.C. § 103.  The PR News article in view of Barrett

discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" <br><br> *Id.* at 1: "Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results." |
|---|---|
| receiving from the data processing device via the communications link a search request that includes a search argument; | PR News at 1: "a Web user looking for Time Warner Inc.'s home page by entering the query term 'Time Warner' in a search engine may find the right site buried beneath many other sites" |
| searching at least one database using the search argument to produce search results; | PR News at 1: "search engines like WebCrawler and Infoseek use 'spiders' or 'robots' to index the Web.  These programs automatically search the Web by indexing one page and then indexing all documents that are hyperlinked to it" <br><br> *Id.* at 1: "Major engines—including Alta Vista, Excite, Infoseek, Lycos, Yahoo! and WebCrawler—use a dataset indexed by the spider to provide a set of related sites" |
| selecting at least one advertisement from an advertisement database relating to at least one of the search argument and the search results; | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines. |

|  | For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results. Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results. Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
|---|---|
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device; | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines. For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results. Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results. Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |

| | |
|---|---|
| receiving search refinement input from the data processing device via the communications link; | Barrett at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| producing modified search results based upon at least the search refinement input; | Barrett at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities."<br><br>It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| selecting at least one other advertisement from the advertisement database based upon at least one of the search refinement input and the modified search results; and | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek.<br>Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. |

| | |
|---|---|
| | WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |
| | Barrett at 5:33-34: "means for actively facilitating user activities based on the developed profile" |
| | *Id*. at 5:44-46: "The invention 'learns' from previous Web surfing activity, so that the user can more efficiently perform subsequent activities." |
| | It would have been obvious for one of ordinary skill in the art of computers to have included a user profile (as disclosed in Barrett) in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits. |
| transmitting at least one of the modified search results and the at least one other advertisement via the communications link to the data processing device. | PR News at 1: "The general solution to avoid getting buried by others' words is to buy a 'search word,' an option introduced last year by several search engines.<br>For example, it is possible for a company to buy its own name or an ad to ensure it is listed at the top of the search results.<br>Time Warner could thus ensure that anyone who enters the term 'Time Warner' will see its home page or ad at the top of the search results.<br>Charges for banner ads in search engines vary, but tend to be expensive, according to Beth Lanahan, spokesperson for one of the Web's more popular search engines, InfoSeek. Depending on Impression and specific topic, advertisements that rotate through directories range from $7,500 to $73,000 for a four-week period.  Advertisements that appear only with the results of a specific key word search are a minimum of $1,000 for a four-week period. WebCrawler, Lycos and Infoseek offer advertisement banner links, however Alta Vista's product is still in beta-test." |

Further, the '065 Examiner explicitly noted—and as the applicants never disputed—that "[i]t would have been obvious for one of ordinary skill in the art of computers to have included a user profile in the search engines disclosed by PR NEWS in order to reduce the search time to return relevant hits."  (December 21, 1998 Office Action at 3.)

210.    One or more of the named inventors of the '178 Patent and others involved in the prosecution of the patent were aware of the existence of the PR News article and the Barrett patent during the prosecution of the '178 Patent; and were also aware that this article and patent were material to the patentability of the '178 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '178 Patent were aware of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious.  Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '178 Patent were aware of the materiality of the PR News article and the Barrett patent because they had been cited by the Examiner as rendering claims of the predecessor '065 Patent anticipated or obvious, and because the prosecutions of the prior patents in that patent family had never traversed those rejections.

211.    Despite its materiality to the application, the named inventors of the '178 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the PR News article and the Barrett patent to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '178 Patent.

212.    On information and belief, the failure to disclose the PR News article and the Barrett patent during the prosecution of the '178 Patent was made knowingly and with intent to deceive the PTO.

213.    Neither the PR News article nor the Barrett patent were independently discovered by the Examiner of the '178 Patent, and neither appear on the "References Cited" of the '178 Patent.

214.    But for the failure of the applicants to disclose the PR News article and the Barrett Patent during the prosecution of the '178 Patent, at least claim 1 of the '178 Patent would not have issued.  As detailed above, the Examiner of the '065 Patent found claim 3 of the application that would become the '065 Patent—which contains very similar requirements as claim 1 of the '178 Patent—invalid in light of the PR News article in view of Barrett.  The Applicants never traversed or even attempted to traverse the rejection.

215.    As a result of the actions described above, all claims of the '178 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '178 Patent.

## 2.    **Failure to Correct False Statements Regarding Open Text Made During Prosecution of the Ancestor '969 Patent**

216.    As detailed in ¶¶ 70 through 77 above, the named inventor(s), the prosecuting attorney(s), and/or other persons owing a duty of candor made false statements regarding Open Text with the intent to deceive the PTO during the prosecution of the ancestor '969 Patent.

217.    At no point during the prosecution of the '178 Patent or its ancestor patents did the Applicants expressly advise the PTO of the existence of the false statements, stating specifically where they reside.  Nor did the Applicants advise the PTO as to the actual facts regarding the functionality of the Open Text search engine.  Nor did the Applicants take the necessary action openly, calling the Examiner's attention to the untrue or misleading assertions

sought to be overcome.  The Applicants' failure to cure the false statements made during the

'969 Patent prosecution renders all claims of the '178 Patent unenforceable due to inequitable

conduct.

       3.       **False Statements Regarding the State of the Art During Prosecution of the '969 Patent**

218.     As detailed in ¶¶ 78 through 84 above, the named inventor(s), the prosecuting

attorney(s), and/or other persons owing a duty of candor made false statements regarding the

state of the art with the intent to deceive the PTO during the prosecution of the ancestor '969

Patent.

219.     At no point during the prosecution of the '178 Patent did the Applicants expressly

advise the PTO of the existence of the false statements, stating specifically where they reside.

Nor did the Applicants advise the PTO as to the actual facts regarding the state of the art.  Nor

did the Applicants take the necessary action openly, calling the Examiner's attention to the

untrue or misleading assertions sought to be overcome.  The Applicants' failure to cure the false

statements made during the '969 Patent prosecution renders all claims of the '178 Patent

unenforceable due to inequitable conduct.

       4.       **Failure to Disclose Kohda Article in an Information Disclosure Statement During Prosecution of the '178 Patent**

220.     The named inventor(s), the prosecuting attorney(s), and/or other persons owing a

duty of candor failed to disclose in an Information Disclosure Statement with the intent to

deceive to the PTO material prior art in their possession, which they knew or should have known

the PTO would consider material to the PTO's decision to grant the '178 Patent.

221.     In May 1996, Youji Kohda and Sesumu Endo published an article entitled

"Ubiquitous Advertising on the WWW: Merging Advertisements on the Browser" in the

*Computer Networks and ISDN Systems* journal.  (Vol. 28, issues 7-11, pp. 1493-1499.) The same

article was also presented at the Fifth International World Wide Web Conference on May 9,

1996 (http://www5.wwwconference.org/fich_html/paper-sessions.html), and is available online

at http://www5.wwwconference.org/fich_html/papers/P52/Overview.html.  The Kohda article

describes a system wherein "[a]dvertisements fetched from advertisers' Web servers are merged

with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on

the users' Web browser."  (Kohda 2.)  Since "the agent is aware of the identity of the user and

which page the user is about to read on the browser, [] the advertising agent can tailor

advertisements for *individuals and their current interests*."  (Kohda 4 (emphasis in original).)

222.    During the prosecution of the parent '065 Patent, the applicants informed the PTO

of the Kohda article in a supplement to an earlier Information Disclosure Statement.  (November

12, 1998 Fax at 7.)

223.    Despite being both aware of the Kohda article and considering it sufficiently

material to submit to the Examiner during the prosecution of the '065 Patent, the Applicants

failed to inform the Examiner of the '178 Patent of the existence of the Kohda article.

224.    Dr. Paul R. Lintz, the Examiner of the '065 Patent to whom the Kohda article was

submitted, was not the Examiner of the '178 Patent.

225.    Under the broadest reasonable interpretation standard used by the PTO, the agent

system described in the Kohda article renders at least claim 1 of the '178 Patent invalid under 35

U.S.C. § 103.  The Kohda article discloses all elements of claim 1:

| 1. A method for operating an advertising machine implemented on at least one computer to provide advertisements via a communications link to a data processing device of a user, the method comprising: | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. |

| | |
|---|---|
| | Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."

*Id*. at 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| receiving from the data processing device via the communications link a search request that includes a search argument; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| searching at least one database using the search argument to produce search results; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver appropriate advertisements which suit each user's taste."

As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument."  (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on <u>any</u> server around on the |

|  | Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
|---|---|
| selecting at least one advertisement from an advertisement database relating to at least one of the search argument and the search results; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| transmitting the search results together with the at least one advertisement via the communications link to the data processing device; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| receiving search refinement input from the data processing device via the communications link; | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| producing modified search results based upon at least the search refinement input; | Kohda 2: "An advertising agent is placed between the advertisers and the users. Advertisements fetched from advertisers' Web servers are merged with Web pages from ordinary Web servers by the agent, and the merged pages are displayed on the users' Web browser. Thus, the users see advertisements on any server around on the Internet. Moreover the agent has chances to deliver |

| | appropriate advertisements which suit each user's taste."<br><br>As the applicants conceded in the '969 Patent examination, "[s]earching, based upon the search argument, a database that identified a plurality of web pages" is a "conventional search engine operation[] in which search results are produced in response to a search argument."  (June 6, 2005 Correct Reply Brief at 7.)  Since Kohda displays advertisements "on <u>any</u> server around on the Internet," Kohda in view of the acknowledged conventional search engines discloses this claim limitation. |
|---|---|
| selecting at least one other advertisement from the advertisement database based upon at least one of the search refinement input and the modified search results; and | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |
| transmitting at least one of the modified search results and the at least one other advertisement via the communications link to the data processing device. | Kohda 4: "When a user clicks an anchor on a page displayed on the browser, the browser contacts the Web server and returns a Web page designated by the anchor. Simultaneously, the browser contacts the advertising agent's Web server. The agent's Web server returns a Web page of one of its advertisements. Then the browser merges those returned Web pages, and displays a composite page on the screen." |

226.    One or more of the named inventors of the '178 Patent and others involved in the

prosecution of the patent were aware of the existence of the Kohda article during the prosecution

of the '178 Patent, and were also aware that the Kohda article was material to the patentability of

the '178 Patent.  Named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their

patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '178 Patent were aware of the Kohda article because they had disclosed that same article to the Examiner of the '065 Patent in an Information Disclosure Statement. Furthermore, named inventors Richard Prescott Skillen, Frederick Caldwell Livermore, their patent agent Bruce E. Garlick, and/or other persons involved in the prosecution of the '178 Patent were aware of the materiality of the Kohda article because they had *already* determined it was material to the '065 Patent, with which the '178 Patent shares a specification.

227.     Despite its materiality to the application, the named inventors of the '178 Patent, the prosecuting attorney(s), and/or other persons having a duty of candor to the PTO failed to disclose the Kohda article to the PTO as prior art in an Information Disclosure Statement during the prosecution of the '178 Patent.

228.     On information and belief, the failure to disclose the Kohda article during the prosecution of the '178 Patent was made knowingly and with intent to deceive the PTO.

229.     The Kohda article was not independently discovered by the Examiner of the '178 Patent, and does not appear on the "References Cited" of the '178 Patent.

230.     But for the failure of the applicants to disclose the Kohda article during the prosecution of the '178 Patent, at least claim 1 of the '178 Patent would not have issued. Related Patent Application No. 13/031,478 is in prosecution before the PTO. The '478 Application shares a specification with the '245 Patent, and both claim priority to the '065 Patent. After the Examiner indicated that the claims had been allowed, the Applicants—who are no longer represented by Garlick—submitted an Information Disclosure Statement on June 26, 2013 that disclosed the Kohda article. The Examiner subsequently withdrew the Notice of Acceptance and found the majority of the pending claims of the '478 Application anticipated by Kohda.

(September 6, 2013 Office Action at 2-6.)  For instance, the Examiner found that portions of Section 2.2 of the Kohda article, excerpted above, disclosed claim elements similar to those found in claim 1 of the '178 Patent.  Had the Examiner of the '178 Patent been aware of the Kohda reference, he would have similarly found at least claim 1 invalid.

231.     As a result of the actions described above, all claims of the '178 Patent are unenforceable due to inequitable conduct committed during the prosecution of the '178 Patent.

## SEVENTH DEFENSE – PATENT UNENFORCEABILITY (UNCLEAN HANDS)

232.     Plaintiffs' claims against Google are barred under the doctrine of unclean hands.

## REQUEST FOR RELIEF

WHEREFORE, Google respectfully requests that the Court enter judgment in its favor and against Plaintiffs as follows:

1)       Dismissing, with prejudice, Plaintiffs' claims against Google;

2)       Denying all relief that Plaintiffs seeks in its Complaint;

3)       Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Google its costs and attorneys' fees; and

4)       Awarding any other relief the Court deems just and equitable.

Dated:  January 10, 2014                      Respectfully submitted,

**MANN | TINDEL | THOMPSON**
300 West Main Street
Henderson, Texas 75652
(903) 657-8540
(903) 657-6003 (fax)

By:  _____*/s/ J. Mark Mann*_____
     **J. Mark Mann**
     State Bar No. 12926150
     **G. Blake Thompson**
     State Bar No. 24042033

**ATTORNEYS FOR GOOGLE INC.**

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically

via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this 10th day

of January, 2014.


_____*/s/ J. Mark Mann*_____

**J. Mark Mann**