# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

ROCKSTAR CONSORTIUM US LP
AND NETSTAR TECHNOLOGIES
LLC,

      Plaintiffs,

  v.

GOOGLE INC.,

      Defendant.

Case No. 2:13-cv-00893-JRG-RSP

JURY TRIAL DEMANDED

## ROCKSTAR CONSORTIUM US LP AND NETSTAR TECHNOLOGIES LLC'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     LEGAL PRINCIPLES OF CLAIM CONSTRUCTION .....................................2

III.    GOOGLE'S INDEFINITENESS ARGUMENTS ................................................2

IV.     TERMS REQUIRING CONSTRUCTION ..........................................................3

      A.      "Advertisement Database" /  "Database Having Advertisement
            Information"...............................................................................................3

      B.      "Advertisement" / "Particular Advertisement" / "At Least One
            Advertisement" ..........................................................................................4

      C.      "Advertising Machine" ..............................................................................6

      D.      "Associative Search Engine" / "Associate Search Engine"......................7

      E.      "Client"/"Client Computer" & "Server/[The] Server Computer" .........9

      F.      "Communications Interface" ...................................................................10

      G.      "Communications Link" ...........................................................................11

      H.      "Correlat[e/ing] the Received Search Argument to a Particular
            Advertisement" ........................................................................................12

      I.      "Database" ................................................................................................13

      J.      "Database Search Engine" .......................................................................14

      K.      "Data Processing Device [of a/the User]" .............................................15

      L.      "Determining Whether the Advertisement Was Successful" ................15

      M.      "Extract a Toll Based Upon The Fee Record" & "Generate a Fee
            Record" ....................................................................................................16

      N.      "Prior Searching History" / "Prior Search History" .............................17

      O.      "Refining The Search Results" / "[Refining/Refine] The Search
            Results Based Upon The Search Refinement Input" / "Refined Search
            Results" ....................................................................................................17

      P.      "Search Argument" / "The Received Search Argument" .....................19

      Q.      "Search Refinement Input" .....................................................................20

R.     "Select[ing] At Least One Differing Advertisement Based Upon The Non-Selection Of The At Least One Advertisement" ............................................21

S.     "Receiv[e/ing] a Response From The Data Processing Device Via The Communications Link That Indicates Non-Selection Of The At Least One Advertisement"............................................................................................22

T.     "User" ...........................................................................................................22

U.     "[Creating] User Preference Data" / "Preference Data for the User"...................23

V.     User Preference Input Terms ........................................................................23

W.     "[The] User Profile Data" ...............................................................................24

X.     "Web Page Data Format"...............................................................................24

V.     TERMS REQUIRING NO CONSTRUCTION.................................................................25

A.     "Search Results" & "Modified Search Results" & "Sorting The Search Results"......................................................................................................25

B.     "Included in a Webpage" ...............................................................................26

C.     "Direct[ing] the Data Processing Device to a Website Corresponding to the Selection of the Advertisement" ....................................................................26

D.     "Display[ing] in the [First/Second] Display Portion of a Display of the Data Processing Device"......................................................................................26

E.     "Data Network Related Information" .................................................................27

F.     "Subsequent Advertisement Selection Operations"...........................................27

G.     "Interacting" & "Updating" Terms ...................................................................27

H.     Easily Understood Terms That Google Erroneously Claims Are Indefinite ....................................................................................................28

VI.     GOOGLE CANNOT SHOW TERMS ARE INDEFINITE FOR LACK OF ANTECEDENT BASIS...................................................................................................28

VII.     ORDERING DISPUTES ...............................................................................................29

# TABLE OF AUTHORITIES

*Cases*

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,*
    616 F.3d 1249 (Fed. Cir. 2010)........................................................................ 6

*Bell Atl. Network Servs. v. Covad Commc'ns Grp.,*
    262 F.3d 1258 (Fed. Cir. 2001)........................................................ 12, 18, 19

*Bose Corp. v. JBL, Inc.,*
    274 F.3d 1354 (Fed. Cir.2001)........................................................................ 29

*Catalina Mktg. Int'l v. Coolsavings,com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002).......................................................................... 15

*Computer Docking Station Corp. v. Dell, Inc.,*
    519 F.3d 1366 (Fed. Cir. 2008)......................................................................... 2

*Energizer Holdings, Inc. v. Int'l Trade Comm'n,*
    435 F.3d 1366 (Fed. Cir. 2006)........................................................................ 29

*Finjan, Inc. v. Secure Computing Corp.,*
    626 F.3d 1197 (Fed. Cir. 2010)........................................................................ 25

*Geomas Ltd. v. Idearc Media Services-West, Inc.,* 2:06-cv-4752008-CE,
    U.S. Dist. LEXIS 97170 (E.D. Tex. Nov. 20, 2008) ...................................... 14

*Geotag, Inc. v. Frontier Comm'ns Corp.,* 2:10-cv-265-JRG,
    2013 U.S. Dist. LEXIS 26971 (E.D. Tex. Feb. 25, 2013) ............................... 14

Markman v. Westview Instruments, Inc.,
    517 U.S. 370 (1996)......................................................................................... 2

MBO Labs., Inc. v. Becton, Dickinson & Co.,
    474 F.3d 1323 (Fed. Cir. 2007)................................................... 8, 9, 10, 21

*Mformation Techs, Inc. v. Research In Motion Ltd.,*
    __F.3d__, 2014 WL 4116459 (Fed. Cir. Aug. 22, 2014) ............................... 29

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    134 S. Ct. 2120 (2014)..................................................................................... 3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008)............................................................................. 25

*Phillips v. AWH Corp.*,
    415 F.3d 1303(Fed. Cir. 2005)..................................................................... 2, 15, 25

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*,
    242 F.3d 1337 (Fed. Cir. 2001)................................................................. 3, 4, 5, 7

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004)............................................................................. 22

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014)............................................................................... 11

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009)....................................................................... 7, 29

*Young v. Lumenis, Inc.*,
    492 F.3d 1336 (Fed. Cir. 2007)............................................................................... 3

## I.    <u>INTRODUCTION</u>

Plaintiffs Rockstar Consortium US LP and NetStar Technologies LLC ("Rockstar") assert that Defendant Google, Inc. infringes certain claims of U.S. Patent Nos. 7,236,969 ("'969 patent," attached as Ex. 1); 7,469,245 ("'245 patent," attached as Ex. 2); 7,672,970 ("'970 patent," attached as Ex. 3); 7,895,178 ("'178 patent," attached as Ex. 4); 7,895,183 ("'183 patent," attached as Ex. 5); and 7,933,883 ("'883 patent," attached as Ex. 6) (collectively, "Patents-in-Suit"). All Patents-in-Suit are from the same patent family and share a common specification. The Patents-in-Suit read on fundamental technology that provides relevant advertisements with search results, and also uses information such as user profile data to further refine the advertisements presented to a user. The Patents-in-Suit contain numerous other claims, such as updating the advertisements a search engine provides by keeping track of whether a user selects an advertisement to more precisely target advertisements and ordering search results using user profile data. The patents also claim a search engine that generates a fee record based on the user's selection of an advertisement. The conception of the Patents-in-Suit predates the formation of Google by approximately two years, and predates the introduction of the accused products by at least four years for some claims, and even longer for others.  Google has infringed and continues to infringe certain claims of the Patents-in-Suit.

Before Rockstar filed suit, its predecessor-in-interest, Nortel, met with Google to discuss the patent family of which the Patents-in-Suit are a part. Indeed, when Nortel auctioned its patent portfolio in 2011, the Patents-in-Suit were the very patents that the parties discussed. As the Court is aware, Google made a $900 million stalking horse bid for Nortel's portfolio, and eventually Google and its partners bid as much as $4.4 billion. The bid was unsuccessful, however, as Rockstar's predecessor, Rockstar Bidco, won the auction with a $4.5 billion bid.

Google now attempts to avoid liability by proposing strained and convoluted constructions that are inconsistent with the intrinsic and extrinsic evidence, that import limitations from the specification or thin air, and that ignore the plain meaning of commonplace nontechnical words. Rockstar, by contrast, proposes that many nontechnical terms need no

construction and should be given their plain and ordinary meaning. Where Rockstar does propose constructions, those constructions stem primarily from intrinsic evidence and where appropriate, extrinsic evidence as well.

## II.  **LEGAL PRINCIPLES OF CLAIM CONSTRUCTION**

Claim construction is a legal question and claims are construed from the perspective of a person of ordinary skill in the art. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  No "elaborate interpretation" is needed for nontechnical terms whose ordinary meanings are apparent. *Id.* at 1314. Courts first consider the claim language and the specification, which are usually dispositive. *Id.* at 1315. In cases such as this, where the construction of terms with no special meaning in the field of art is sought, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.*

Otherwise, courts consider the claim language, the specification, prosecution history, and extrinsic evidence. *Id.* The specification and claim language are "[u]sually . . . dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315. Prosecution history may be helpful, but "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1315. A party arguing surrender of claim scope during prosecution must demonstrate a clear and unmistakable disavowal of claim scope. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008). Though extrinsic evidence may be used in certain circumstances, it should not "change the meaning of the claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history." *Phillips,* 415 F.3d. at 1319 (quotation marks omitted).

## III.  **GOOGLE'S INDEFINITENESS ARGUMENTS**

The patent statute's definiteness provision requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope

2

of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). Defendants bear the burden to show indefiniteness by <u>clear and convincing evidence</u>. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007). In this case, Google claims that each term in Appendix A, Section I is indefinite.  Google cannot come close to meeting its burden. As explained in more detail below, each term Google contends is indefinite is easily amenable to construction, and that construction is amply supported by the evidence. Given that it is Google's burden to establish indefiniteness, Google must come forward with evidence of indefiniteness before Rockstar can fully respond.

## IV.  TERMS REQUIRING CONSTRUCTION

### A.  "Advertisement Database" / "Database Having Advertisement Information"

An advertisement database is simply "a database of advertisements or advertisement-related information." That is the obvious and plain meaning of the term. The plain language of the claims supports this interpretation. For instance, claims 1, 7, 8, 17, and 22 of the '969 patent describe the second database (*i.e.* the advertisement database) as "a second database having advertisement related information." *See also* '970 patent, claims 1, 8-10, 15, 16 ("select at least one advertisement from an advertisement database"). Rather than accept this, Google ignores the plain claim language and proposes to require an advertisement database to contain products or services in addition to advertisements. Furthermore, Google's construction limits the advertisements to only those specifically corresponding to the "product and services."

Google relies on embodiments in the specification that describe selecting products from a database to import this limitation into the claims. However, none of the claims mentions products or services being found in the advertisement database, rather, the claims only require that advertisements be found in the advertisement database. Had the patentee wished to claim a products or service database, they certainly could have done so, but they did not. Instead, the patentee claimed an advertisement database. Thus, Google commits the "cardinal sin" of claim construction, importing a limitation from the specification. *See SciMed Life Sys., Inc. v.*

*Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). In sum, nothing in the claims requires the presence of products or services in the "advertisement database." Accordingly, Google's attempt to import this limitation into the claims should be rejected.

**B. "Advertisement" / "Particular Advertisement" / "At Least One Advertisement"**

Though Google proposes that these terms require construction, neither Google nor Rockstar provide any construction for the word "advertisement." Accordingly, "advertisement" should be given its plain and ordinary meaning. Likewise for "at least one advertisement." And the term "particular advertisement" is also construed as part of the larger "correlating" term. *See* Part H, *infra*. It is thus unnecessary to separately address "particular advertisement." Nevertheless, Rockstar proposes an alternative definition that mirrors the plain language and the specification—"a relevant advertisement from a plurality of possible advertisements" By contrast, Google's construction—"advertisement that is <u>closest to the need of the user</u>"—violates several canons of claim construction by importing a limitation from the specification and excluding preferred embodiments.

Rockstar's proposed construction, that an advertisement is chosen based on relevance, finds continuous support in the specification. Indeed, the specification repeatedly and emphatically ties providing an advertisement to relevance.  The object of the invention is to "find the <u>relevant</u> information for which the user is looking," '969 patent, 1:38-39 and "to provide a new and improved associative search methodology for retrieving <u>related</u> information," *id.* at 1:43-45; *see also id.* at 1:13-15. "The invention, therefore . . . correlate[s] the received search argument <u>to a particular advertisement</u> in a second database having advertisement related information." *Id.* at 1:46-55.  The specification further explains that the invention "formulates the necessary strategy and tactics to offer products that would <u>appeal</u> to the end user[,]" in order to provide "unobtrusive, related, and useful data and options to the end user who is searching for information." *Id.* at 2:28-29, 2:38-39.

Google ignores this teaching from the specification and instead tries to limit the claims to one example in the specification. Nothing in the plain language of the claims requires that the

selected "advertisement" must be the one that is "closest to the need of the end user." Those words are simply absent from the claims. Thus, in attempting to import that limitation into the claim from the specification, Google commits the "cardinal sin" of claim construction. *See SciMed Life*, 242 F.3d at 1340.

Moreover, the embodiment itself is not as narrow as Google suggests. As a threshold matter, while an embodiment does describe selecting advertisements that are closest to the need of the user as determined by the associative search engine, other embodiments from the specification demonstrate other manners to show relevant advertisements to a user. For example, the specification also describes an embodiment where an associative search engine either "<u>may</u> determine a logical product fit to the initial search argument, <u>or</u> it <u>may</u> create a logical tree analysis of possible product fits and selects a probable best product for an advertisement window to be displayed with the search results." '969 patent, 4:45-50 (emphasis added); *see also id.* 6:7-13. Not only does the embodiment contain "or" language, nothing in this embodiment suggests that the "probable best" advertisement is the advertisement "closest to the needs of the user." Accordingly, Google's construction excludes this embodiment.

Another embodiment provides for a "continually updated product advertisement that is considered to be most relevant (best fit) at that point in the search." *Id.* 6:40-42. The described "most relevant" advertisement is not necessarily the advertisement that is "closest to the need of the user," rather, it is an advertisement that the associative search engine has selected as the most relevant at a given point. *Id.* That advertisement is continually updated as searching continues, thus providing increasingly relevant advertisements to the user. Google's construction, which requires that the advertisement is the one that is "closest to the need of the end user," excludes the provision of increasingly relevant advertisements over time, and thus excludes another preferred embodiment. And even within the embodiment that Google focuses on, Google notably excludes the entire phrase—i.e., "closest to the need <u>as determined by the associative search engine</u> 18 of the selling machine 10." *Id.* at 4:33-35; *see also* 5:47-48.  In other words, it is the

search engine—not the user—that determines fit and relevancy, an important part of the embodiment that Google's definition omits.

Finally, unlike Google's construction, Rockstar's construction encompasses all preferred embodiments including those described above as well as Google's "closest to the need of the end user" embodiment. After all, an advertisement that is closest to the need of the end user is undoubtedly relevant.

### C. "Advertising Machine"

The parties' constructions of this term differ in only one respect: Google attempts to limit the advertising machine to a single computer even though the specification contains no such limitation and, indeed, describes embodiments wherein the advertising machine is composed of several computers. Google's construction should be rejected because it reads a limitation into the claims from thin air and excludes a preferred embodiment.

Nothing in the claims limits the advertising machine to a single computer. In fact, many of the asserted claims explicitly require an advertising machine comprising "at least one computer." *See, e.g.*, '245 patent, claims 1, 9, 18; '970 patent, claims 1, 10, 17, 26. Moreover, no support in the specification exists for the proposition that the advertising machine <u>must</u> be composed of a single computer. Accordingly, Google's attempt to limit the advertising machine to a single computer derives support solely from Google's own imagination. Furthermore, Google's construction would render the claims nonsensical because certain claims expressly state that the advertising machine comprises multiple computers. For instance, claim 17 of the '969 patent recites "An advertising machine comprising: [a] first database . . . being contained on <u>the server computer</u>; . . . [a] second database contained on <u>a client computer</u>." Thus, the claims contemplate an advertising machine comprising multiple computers. *See also* '969 patent, claim 22. Google's construction would render these claims nonsensical and should be rejected. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'") (citations omitted).

### D.  "Associative Search Engine" / "Associate Search Engine"

As an initial matter, Google contends that the term "associate search engine" is indefinite. It is not. "Associate" occurs only in the claims, not the specification, and is plainly used interchangeably with "associative." Such obvious typographical errors do not render claims indefinite and the "court can correct an obvious typographical error." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009).

Rockstar's definition is consistent with the specification's emphasis on relevancy—"a search engine that selects an advertisement relevant to the need of the end user." Google's proposed construction—"a search engine that selects <u>the product or service</u> that is <u>closest to the need of the end user</u>"—is incorrect for at least three reasons. *First*, Google errs in demanding that the selection be "closest to the need of the end user." As discussed above in the "advertisement" definition, nothing in the plain language of the claims requires that the selection provided by the associative search engine must be the one that is "closest to the need of the end user." Rather, Google imports that limitation from the specification in contravention of well-established law. *See SciMed Life*, 242 F.3d at 1340. Moreover, the specification is clear that the associative search engine retrieves related information, not necessarily information that is closest to the need of an end user. '969 patent, 1:13-15 ("The invention generally relates to search engines and, in particular, to an <u>associative search</u> methodology, . . . for <u>retrieving related information</u>."); 1:43-45 ("It is an object of the present invention to provide a new and improved <u>associative search methodology for retrieving related information</u>."). The specification describes multiple ways for making a selection. *See id.* at 4:45-50 ("The associative search engine 18 <u>may</u> determine a logical product fit to the initial search argument, <u>or</u> it <u>may</u> create a logical tree analysis of possible product fits and selects a probable best product for an advertisement.") Thus, the associative search engine may determine a logical product fit or it may create a logical tree analysis of possible product fits, but nothing requires that the selection <u>must</u> be that which is "closest to the need of the end user." Indeed, the specification decidedly does not limit the associative search engine to closest fit. Instead, the patent describes that the "associative engine

of the selling system examines the user's choices and search instructions, that have been input by the user, and formulates the necessary strategy and tactics to offer products that would appeal to the end user" in order to offer "unobtrusive, related, and useful" information. *Id.* 2:26-37 (emphasis added). Finding an advertisement that "appeal[s]" to the user does not always mean finding an advertisement that is "closest to the need" of the user.

Furthermore, for one, Google omits from its construction relevant language from the specification, which states "closest to the need as determined by the associative search engine." *Id.* 5:47-48; *see also* 4:29-35. This omission is a transparent attempt to avoid infringement by distorting the claims to require some indeterminable and singular "closest need of the end user." In reality, the associative search engine determines the product advertisement using information to identify relevant advertisements and those relevant advertisements vary during use of the engine. Indeed, this was the express problem the described invention was meant to solve. *See id.* 1:37-39 ("The problem or opportunity still remains to quickly find the relevant information for which the user is looking.").

Second, in attempting to limit selection to a "product or service," but not an advertisement, Google excludes not only a preferred embodiment, but the claimed embodiment of selecting an advertisement. The specification describes an embodiment wherein an advertisement is selected. *Id.* 5:16-26 (associative search engine "select[s] a best fit product advertisement."); 6:11-14 ("The associative search engine 40 creates a logical tree analysis of possible product fits, and selects or creates a probable best product advertisement."); *see also* 2:43-57; 4:24-5:15; 6:37-44. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (citation omitted). Likewise, the claims call for an associative search engine that selects advertisements. *See, e.g.,* '245 patent, claim 9 ("an associative search engine operable to: . . . select at least one advertisement."); '969 patent, claim 17 ("an associative search engine . . . that correlates the received search argument to a particular advertisement"), claim 22; *see also* '970 patent, claims 1, 8, 10, 11, 15.

Third, Google unjustifiably attempts to limit the term to the selection of <u>the</u> product or service (implying singular) rather than using the word "a." This contradicts the specification which calls for "<u>a</u> particular advertisement." '969 patent, 1:54; *see also* 6:11-14; 4:24-5:15; 6:37-44. It also contradicts the plain language of several claims that call for the selection of "at least one advertisement." *See, e.g.*, '245 patent, claim 9 ("an associative search engine operable to: . . . select <u>at least one advertisement</u>."). This Court should adopt Rockstar's proposed construction—"a search engine that selects an advertisement relevant to the need of the end user"—because it avoids all of these problems present in Google's construction.

**E.   "Client" / "Client Computer" & "Server/[The] Server Computer"**

Rockstar's proposed constructions of "client" and "server"—"a computer that sends and receives information from a server" and "a computer that provides services to a client computer," respectively—are consistent with the claims, the specification, and supported by extrinsic evidence. Google's proposed constructions—"end user computer" and "a computer that provides services to client programs on end user's computers"—contradict the specification and render the claims nonsensical. Nowhere in the patents is "client" equated with the "end user computer"—a concept Google wishes to import into both the "client" and "server" terms. To the contrary, the claims make clear that both the "client" and "server" computers are part of the advertising machine and located with the access provider, not the end user. *See, e.g.*, '969 patent, claim 15 ("[T]he client computer is an access provider computer."); claims 17, 22 ("[T]he advertising machine comprising: [a]n associative search engine coupled to the <u>server computer</u> that correlates the received search argument to a particular advertisement in a second database . . . contained on a <u>client computer</u>.") (emphasis added). Google's constructions contradict this claim language.

The specification likewise includes preferred embodiments where (1) the server 38 as well as the second database 42 (housed on the client computer, per the above claims) are <u>part of</u> the advertising machine while (2) the "end user" 12 is <u>separate</u> from the advertising machine. *See, e.g.*, *id.* FIG. 2; 5:28-36 (disclosing "[t]he advertising machine 30" is "embodied at an

Internet-access provider equipment site 32" which "includes" a "server 38"); 5:39-42 (disclosing "[t]he associative search engine 40 . . . correlates a search argument" with "the product database 42"). The specification consistently describes the end user's computer as a "data processing device" and not a "client computer." *Id.* FIGS. 1 & 2; 3:60-4:16 (describing "the data processing device 12" labeled in FIG. 1 as "End User"); 5:59-60 (describing the "data processing device 12 of the end user" in FIG. 2). And while the specification explains that the "server 38 . . . in general controls operation and couples data calls terminated by equipment 34 to router 36," it says nothing about the server providing services to "client programs" on the "end user's computers." Google's constructions contradict the specification and read out preferred embodiments.

Google's own extrinsic evidence confirms that neither a "client" nor "server" computer includes the "end user" limitation that Google seeks to import into the claims. *See* Barron's Dictionary of Computer and Internet Terms (5th ed. 1996) (defining "client" as "a computer that receives services from another computer" where "[t]he machine or process that is supplying the services is called the server" and "server" as "a computer that provides services to another computer (called the client)") (Ex. 7); Webster's New World Dictionary of Computer Terms (8th ed. 2000) ("In a client/server network, a program that is designed to request information from a server.") (Ex. 8); Newton's Telecom Dictionary (16th ed. 2000) ("Clients are devices and software that request information" while "[a] server is a program which provides some service to other (client) programs") (Ex. 9). The claims, specification, and extrinsic evidence thus confirm that Rockstar's proposed constructions are correct: a "client [computer]" is "a computer that sends and receives information from a server," and a "server [computer]" is "a computer that provides services to a client computer."

## F.  "Communications Interface"

Google claims this term is indefinite or, alternatively, the term is limited to a "browser application." As noted above, Google bears a heavy burden to show that this term is indefinite. Should Google come forward with evidence of indefiniteness, Rockstar will fully respond.

Google's alternative construction is not only nonsensical, but is in direct conflict with the plain language of the claims. Google claims that the communications interface is a "browser application," which according to the specification runs on the user's data processing device. *See* '969 patent, 4:1-5. By contrast, the claims require a communications interface that is part of the advertising machine and, thus, not part of the user's data processing device. *See, e.g.*, '245 patent, claim 9 ("the advertising machine comprising: a communications interface operable to interface with the data processing device."); *see also* '970 patent, claim 33 ("the server computer comprising: at least one communications interface."). Thus, Google's construction cannot possibly be correct.

Rockstar, by contrast, proposes that "communications interface" be given its dictionary definition. Random House Webster's College Dictionary (2d ed. 1999) gives the following definition: "computer hardware or software designed to communicate information between hardware devices, between software programs, between devices and programs, or between a computer and a user." (Ex. 10). This definition not only reflects the ordinary meaning of the term to one of ordinary skill, but is in harmony with the claim language that requires "the server computer comprising: at least one communications interface operable to interface with the data processing device of the user." '970 patent, claim 33.

### G. "Communications Link"

The specification is clear and both parties agree that a "communications link" is "the network connection between the data processing device and the advertising machine." *See id.* 3:62-65 (referring to "a communications link 14 through which the device 12 interacts with the advertising machine 10. The communications link 14 may be provided by a global data network, typically the Internet."). Google, however, relies on extrinsic evidence to include the word "physical" so as to require a "physical network connection." This is inappropriate. The specification does not limit it to physical connections. The word "physical" is not found anywhere in the speciation. The addition of "physical" thus improperly limits the claims using solely extrinsic evidence. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed.

Cir. 2014) (citing *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . <u>may not be used to</u> vary, contradict, expand, or <u>limit</u> the <u>claim language</u> from how it is defined, even by implication, in the specification or file history.")). Moreover, other extrinsic evidence contradicts Google's assertion that the communications link must be physical. *See* Federal Standard 1037C, *Telecommunications: Glossary of Telecommunication Terms* (August 7, 1996) (defining link as "In communications, a general term used to indicate the existence of communications facilities between two points" and as "[a] conceptual circuit, i.e., logical circuit, between two users of a network, that enables the users to communicate, even when different physical paths are used.") (Ex. 11)

### H.   "Correlat[e/ing] the Received Search Argument to a Particular Advertisement"

Rockstar's proposed construction of this term—"identifying a relevant advertisement from a plurality of possible advertisements based on the received search argument"—is faithful to the claims and the specification. For example, claim 1 of the '969 patent recites "correlating the received search argument to a particular advertisement in a second database having advertisement related information; and providing the search results together with the particular advertisement to the user." Thus, the invention of claim 1 uses the search argument to identify a particular advertisement and then provides it to the user. The specification also supports this interpretation. *See id.* 1:37-39 ("The problem or opportunity still remains to quickly find the <u>relevant</u> information for which the user is looking."). The discussion in the definition of "advertisement," and "associative search engine," *supra* Part IV.B and D, provide further support for why relevancy is the touchstone here.

Unlike Rockstar, Google does not actually construe the term "correlating," but rather hopes to replace it with the word "matching." This makes little sense. Both terms are common English words used in the patent. '969 patent, 4:44; 4:27. Moreover, these words have different definitions. *See* NTC's American English Learner's Dictionary (1998) (defining "correlate" as "to establish and show a relationship between two things" and "match" as "[for something] to be exactly like something else; to fit something exactly; to go with something well.") (Ex. 12). Had

the patentees wanted to use the term "matching" in the claims, they could have, but they chose not to. Instead, they chose the word "correlating." Moreover, Google's proposed construction would exclude those embodiments where a "match" is not provided. For example, the specification describes providing a "continually updated product advertisement that is <u>considered to be most relevant (best fit)</u> at that point in the search." '969 patent, 4:65-5:2. The best fit or most relevant advertisement may not be a "match," it may simply be the most relevant advertisement selected from a group of possible advertisements. The specification describes that possibility as well, stating, "[t]he associative search engine . . . may create a logical tree analysis of possible product fits and select[] a probable best product for an advertisement." *Id.* at 6:11-13. Google's construction excludes these embodiments by requiring "matching" and should be rejected.

## I.   "Database"

The parties agree that the term "database" is "an organized collection of data."  However, the parties dispute whether an organized collection of data must necessarily be "stored on a computer storage medium."  Rockstar's proposed construction is consistent with the specification's discussion and the claims' use of "database"—that is, without reference or regard to what type of medium it may be stored on. Databases were well-known at the time of the invention and the use of this term in the claims and the specification is consistent with the meaning Rockstar has proposed.

Google's proposed construction injects a storage-medium limitation that finds no support in the intrinsic evidence and improperly narrows the scope of the claims.  Google's construction, which seeks to exclude transient storage mediums, also finds no support in the extrinsic evidence. Tellingly, four out of five dictionary definitions of "database" supplied by Google do not require a storage medium. *See* Random House Webster's College Dictionary (2d ed. 1999) (Ex. 13); Newton's Telecom Dictionary (16th ed. 2000) (Ex. 14); Modern Dictionary of Electronics (6th ed. 1997) (Ex. 15) (two definitions).  Yet Google cherry picks the only self-

serving definition it could find as its proposed construction.  *See* Dictionary of Computer & Internet Terms (5th ed. 1996) (Ex. 16).

Thus, there is no need to limit "database" to a storage medium because such a limitation is neither evident in the claims nor inferable from the specification. In addition, the extrinsic evidence overwhelmingly favors Rockstar's proposed construction, which also finds support in constructions reached by this Court in prior cases.  *See, e.g.*, *Geotag, Inc. v. Frontier Comm'ns Corp.*, 2:10-cv-265-JRG, 2013 U.S. Dist. LEXIS 26971, at *55-56 (E.D. Tex. Feb. 25, 2013) (construing "database" to mean "a collection of information, or of data, that is organized to facilitate retrieval of selected information or data"); *Geomas Ltd. v. Idearc Media Services-West, Inc.*, 2:06-cv-4752008-CE, U.S. Dist. LEXIS 97170, at *19 (E.D. Tex. Nov. 20, 2008) (construing "database" to mean "a collection of information or data organized such that a computer program can quickly retrieve selected information or data").

### J.   "Database Search Engine"

Google claims this term is indefinite. Should Google come forward with evidence of indefiniteness, Rockstar will fully respond. Notably, Google does not contend that "database" is indefinite or that "search engine" is indefinite as Google has proposed constructions for both of these terms either alone or in combination with another term. *See* Defendant's Claim Constructions and Evidence for Disputed Terms (Dkt. No. 121-2), at 1, 2, 6, 16, 19.

Rockstar's proposed construction—"one or more interconnected computers that receive a search argument and search a first database to generate search results"—finds ample support in the specification. The specification calls database search engines "conventional technology" that receive "search arguments" and "search . . . contextual data in the database and return[] results." '969 patent, 4:12-24. The searched contextual data "typically contains information relating to the Internet, for instance, keywords associated with respective WWW site locations." *Id.* The specification also distinguishes between the database and associative search engines. *See id.* 4:39-40; 59-65. Accordingly, Rockstar's construction, which reflects the conventional meaning of a database search engine as described in the specification, should be adopted.

### K.  "Data Processing Device [of a/the User]"

The parties dispute whether a "data processing device" may be, as Rockstar proposes, any Internet-capable device (such as a desktop computer, laptop, tablet, or smartphone), or whether it should be limited to, as Google proposes, a desktop computer with such capability. The specification provides the following definition: "the data processing device 12 may be <u>any</u> conventional hardware/software combination supporting functionality for communications over the Internet." '969 patent, 3:65-4:1 (emphasis added). The specification explains what this means by giving "[e]xamples of the data processing device 12 [to] include a personal computer (PC) or Macintosh executing an appropriate browser application, such as, Netscape Navigator[.]"  *Id.* 4:1-4.  Yet, against all logic, Google ignores the given definition and seeks to limit the term to "a desktop computer, such as a personal computer (PC) or Macintosh, executing a browser"—the very <u>examples</u> used in the specification to illustrate a "data processing device."

*Phillips* bars courts from construing claims to be limited by examples given in the specification, 415 F.3d at 1323, and Google's proposed approach defies *Phillips*. The word "[e]xamples" in the specification clearly introduces "a personal computer (PC) or Macintosh executing an appropriate browser application" as two species of a "data processing device." '969 patent, 4:1-3. Because the PC or Macintosh executing an appropriate browser application are mere "example[s] of a broader genus" of a "data processing device," the Court should reject Google's proposed construction "rather than limit[] the genus to the exemplary species." *Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002).

### L.  "Determining Whether the Advertisement Was Successful"

According to Google, one of ordinary skill in the art would be so befuddled by this term that its meaning could not be reasonably ascertained and is therefore indefinite. In the unlikely event that Google comes forward with evidence of indefiniteness, Rockstar will fully respond.

In reality, the meaning of this term—"determining whether a user clicked on (selected) a particular advertisement when presented"—is easily ascertained by looking to the specification. Common sense indicates that a successful advertisement is one that the user selected (for

example, clicked on) and viewed.  Indeed, this is exactly what the specification describes in stating, "[o]nce the end user clicks on (selects) the advertisement . . . , an appropriate message is sent to the advertising machine 10 and, in particular, to the associative search engine." '969 patent, 5:6-9.  Moreover, failure is the opposite of success and the specification associates failure with the user <u>not</u> clicking on the advertisement. *Id.* 5:3-5 ("failure of the end user to click on the advertisement is used as a criterion in the logical tree in providing the appropriate advertisement."). Accordingly, the proper construction of this term is "determining whether a user clicked on (selected) a particular advertisement when presented."

### M. "Extract a Toll Based Upon The Fee Record" & "Generate a Fee Record"

Rockstar proposes that "generate a fee record" and "the fee record" be construed as "[generate] a record reflecting that an advertisement has been clicked on (selected)." This construction is evident from the plain claim language and is supported by the specification. The relevant claims state, "based upon the advertisement selection, generate a fee record." '970 patent, claim 1; *see* claim 17 ("the advertising machine <u>generating a fee record based upon the selection of the advertisement</u>."). The fee record accordingly reflects the fact that the advertisement has been selected. The specification equates selection with an advertisement being clicked on. *See* '969 patent, 5:6-7 ("the end user clicks on (selects) the advertisement"); *see also id.* 6:33-34. Thus, these terms are properly construed as "[generate] a record reflecting that an advertisement has been clicked on (selected)." Despite the plain language of the claims, Google attempts to alter the claim language by importing the requirement that the fee record reflect a "toll for bringing a buyer and seller together." The claims do not recite generating a fee record for "bringing a buyer and seller together," nor do they imply any such thing. The claims merely require that an advertisement be "selected" (that is, "clicked on").  As such, Google's attempt to import this additional limitation from the specification should be rejected.

With respect to the "extract a toll based upon the fee record," Google reinterprets this term to require the advertising machine to "obtain payment of a fee recited in a fee record."  No such reinterpretation is needed or helpful. Google reads this term in isolation and distorts its

meaning. Nothing in the claims or specification requires the advertising machine to obtain the actual payment of a fee recited in a fee record. Rather, the claims recite an "advertising machine is further operable to extract a toll based upon the fee record." '970 patent, claim 1. It is nonsensical to require the "advertising machine" itself to go out and <u>obtain</u> payment. Rather, the more natural interpretation of this language is that the advertising machine "determines an amount to be paid based upon the fee record" as proposed by Rockstar so that payment can then be obtained.

    **N.  "Prior Searching History" / "Prior Search History"**

The parties agree that "prior search history" contains "previous search arguments," but disagree whether the "prior search history" belongs to "<u>a</u> user," as Rockstar contends, or is limited to those of "<u>the</u> user," as Google mistakenly suggests.  Rockstar's proposed construction is favored by the language of the claims. Where the patentee sought to limit the prior searching history to a singular user, they expressly did so.  *See* '883 patent, claims 5, 14, 24 ("user profile data is based upon prior search history of the user.") Where the claims expressly state that it is the prior search history of the user, it would be redundant to construe "prior search history" as "<u>the</u> user's previous search arguments." By contrast, other claims contain no such limitation. *See* '245 patent, claims 7, 16, 24 ("user preference data is derived from prior searching history.") Thus, where the claims do not recite prior search history of <u>the</u> user, the claims should not be so limited.

    **O.    "Refining The Search Results" / "[Refining/Refine] The Search Results Based Upon The Search Refinement Input" / "Refined Search Results"**

Rockstar proposes that, to the extent these terms need construction, these terms be construed as "modifying search results based on search refinement input from the user" and "search results produced after receiving search refinement input from the user," respectively. Google construes these terms as "<u>narrowing</u> the previous set of search results." Nothing in the claim language requires that "refined search results" be a <u>narrowed</u> subset of the original search results. To the contrary, Google's construction would exclude preferred embodiments found in the specification. The specification discloses a "process" in which (1) the end-user device sends

a "search argument to the database search engine;" (2) the search engine "carrie[s] out a traditional search of Internet related information" and "passes the argument and results" to the "associative search engine—which may "select a probable best product for an advertisement window to be displayed with the search results;" (3) the search results and advertisement are "display[ed] to the end user;" (4) the end user "<u>refines his or her search</u> by either clicking on a displayed result or refining their search through additional arguments or search criteria;" and (5) the "associative search engine" and "database search engine . . . <u>again work together in providing refined data as in (2) above</u>." '969 patent, 4:39-65; 5:65-6:30. The specification thus teaches that the user refines his search by clicking on certain results or even using additional search criteria, which could result in <u>expanding</u> rather than <u>narrowing</u> his search results. Moreover, the specification teaches that after receiving "search refinement input" from the user's device, the search engine performs a new search and produces "refined data" via the <u>same process</u> as the original search in step two—a "traditional search of Internet related information." Google's construction excludes these preferred embodiments and improperly limits the claims to a single embodiment where the "refined search results" are a narrowed subset of the previous search results.

Because nothing in the claim language or the specification indicates that "refined search results" must be "narrowed" results relative to the original search results, Google rests its construction on dictionary definitions of "refine." But Google's own dictionaries suggest that "refine" means to "improv[e]" or to make more "precise," and not necessarily to "narrow." Webster's Third New International Dictionary (1993) (Ex. 17); Random House Webster's College Dictionary (2d ed. 1999) (Ex. 18). And, in any event, such dictionary definitions cannot overcome the compelling evidence from the claim language and specification that "refined search results" are not limited to a narrowed subset of the original results. *Bell Atl. Network*, 262 F.3d at 1269 ("[E]xtrinsic evidence . . . <u>may not be used to</u> vary, contradict, expand, or <u>limit</u> the <u>claim language</u> from how it is defined, even by implication, in the specification or file history."). Rockstar's constructions—that "refining the search results" means "modifying search results

based on search refinement input from the user" and "refined search results" are "search results produced after receiving search refinement input from the user"—are consistent with the claim language, the specification, and Google's dictionary definitions.

### P.   "Search Argument" / "The Received Search Argument"

The specification discloses "[t]he database search engine," an example of which "provides searches based on subject, <u>strings</u>, boolean, <u>text</u>, etc." It then discloses that "[s]uch <u>input search arguments</u> may be <u>received from</u> an end user via the <u>data processing device</u> . . . ." '969 patent, 4:12-17. The claims similarly confirm that the "search argument" is received from the "data processing device." *See, e.g.*, '245 patent, claim 1. Thus, Rockstar's construction of "search argument" as "the text or strings received from the data processing device" is correct. Google seeks to import limitations that the "search argument" must not just be text received from the user's data processing device, but rather must be (1) the exact text that the user "enter[s]" and (2) "submitted to the search engine" in the same form the user "entered" it. This is wrong for several reasons.

Google's construction is inconsistent with the specification and reads out preferred embodiments. The specification teaches that the "associative search engine" may "correlate[] a search argument <u>derived from</u> the user"—an embodiment that Google's construction would exclude. '969 patent, 4:24-29; 5:38-42. Similarly, the specification repeatedly teaches that the selling machine or associative search engine "searches, <u>based upon</u> the received search argument" and "correlat[es] the received search argument to a particular advertisement . . . ." *Id.* Abstract; *see also id.* 1:49-55; 1:60-65; 2:3-8; 2:14-19. And it teaches that the "correlating" function "may determine a logical product fit to the initial search argument, <u>or</u> it may create a logical tree analysis of possible product fits . . . ." *Id.* 4:45-50. None of these disclosures requires that the database search engine or associative search engine receive, as a direct input, the very text that is entered by a user without change. Instead, they require only that the search be "based on" the search argument and that the advertisement "correlat[e]" to the search argument.

Furthermore, the claim language does not require that the "search argument" as typed or entered by the user be "submitted" as-is to "the search engine." For example, the claim 33 of the '970 patent recites that "[t]he server computer" is operable to (1) "receive from the data processing device . . . a search request that includes a search argument;" (2) "interact with the database search engine to receive search results . . . based upon the search argument;" and (3) "interact with the associative search engine to receive an advertisement that is selected based upon at least one of the search argument and the search results . . . ." Contrary to Google's position, the term "the search engine" does not appear in this claim at all; rather, there is a "database search engine" and an "associative search engine." Google's construction therefore introduces a term lacking an antecedent basis in the claim. In any event, the claim does not indicate that the search argument as typed by the user was ever "submitted" to either the "database search engine" or "associative search engine"; instead, the "search argument" is received from the "data processing device" by the "server computer"—which is separate from either search engine. Finally, the claim indicates that both search engines act "based on" the search argument—it does not require that they use the same text, in unaltered form, as typed by the user. Other claims are similar. *See*, *e.g.*,'969 patent, claims 17, 22; '245 patent, claim 9; '183 patent, claim 14; '883 patent, claim 20.

## Q.  "Search Refinement Input"

Rockstar proposes that "search refinement input" is "input from the user refining a search request," consistent with the plain claim language. Google, however, seeks to import the additional and vague limitation that it is "information regarding a search query entered after receiving the initial set of search results." This construction finds no support in the claim language or specification. Moreover, the specification teaches that the user "refines his or her search by either clicking on a displayed result or refining their search through additional arguments or search criteria." '969 patent, 4:54-56. Neither "clicking on a displayed result" nor providing "additional arguments or search criteria" is "information regarding a search query" that has already been performed. Accordingly, Google's construction would exclude

embodiments of "search refinement input" that involve "clicking on a displayed result" or "refining through additional search arguments" and should be rejected. *MBO Labs*, 474 F.3d at 1333.

### R. "Select[ing] At Least One Differing Advertisement Based Upon The Non-Selection Of The At Least One Advertisement"

Claims 11 and 27 of the '970 patent recite "[t]he associative search engine is further operable to select at least one differing advertisement based upon the non-selection of the at least one advertisement." '970 patent, claims 11, 27. Consistent with the claim language and specification, Rockstar construes this term as "selecting at least one different advertisement based on a response from the user's data processing device that indicates that the user did not click on (or select) a particular advertisement or advertisements when presented." Google's construction is unfaithful to the claim language in two ways: it replaces the word "differing" with "replacement" and fails to recognize that "non-selection" means the user did not click on the advertisement.

There is zero evidence to support Google's interpretation of equating "differing" with "replacement." Nothing in the claims requires that the "differing advertisement" replace "the at least one advertisement." To the contrary, it could be that the "differing advertisement" will now be displayed alongside "the at least one advertisement" rather than replace it altogether. The term "replacement" also does not appear anywhere in the specification or the claims. Moreover, the specification makes clear that "non-selection" means failure to click. The patentee has acted as his own lexicographer, explicitly defining "select" as "click." '969 patent, 5:4-6 ("Once the end user clicks on (selects) the advertisement"). Similarly, the specification teaches that "failure of the end user to click on the advertisement is used as a criterion in the logical tree in providing the appropriate advertisement." *Id.* 4:67-5:3. Google has no basis for substituting the word "replacement" in place of "differing" and for failing to include the express definition of non-selection as failure to click. By contrast, Rockstar's construction is consistent with the claim language and specification, as it requires "selecting at least one different advertisement based on

a response from the user's data processing device that indicates that the user did not click on (or select) a particular advertisement or advertisements when presented."

**S.      "Receiv[e/ing] a Response From The Data Processing Device Via The Communications Link That Indicates Non-Selection Of The At Least One Advertisement"**

The parties' dispute centers on the term "indicates" and what indicates "non-selection" of an advertisement. Rockstar's proposed construction—"receiving a response from the user's data processing device via the communications link that <u>indicates</u> that the <u>user did not click on (or select)</u> a particular advertisement when presented"—is consistent with the plain claim language and the specification.  Google, on the other hand, changes "indicates" to "shows"—thus altering the term's meaning and ignoring how non-selection is defined in the specification.

Rockstar proposes that the term "indicates" be given its plain and ordinary meaning, which is readily apparent when it is read in the context of the entire claim element.  Google's proposed construction of "shows" unjustifiably swaps one term for another, provides no additional value, and serves to needlessly confuse the jury. *Cf. Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356 (Fed. Cir. 2004) (purpose of claim construction is to provide the jury with clear guidance). Moreover, Google fails to construe non-selection. The specification is clear as to what constitutes selection and non-selection alike. The specification repeatedly equates selection with "clicks on." *See* '969 patent, 5:6 ("the end user clicks on (selects) the advertisement"); *see also id.* at 5:52. Likewise, the specification is clear that non-selection is indicated by the failure of the user to click on an advertisement. *Id.* 5:3-5 ("failure of the end user to click on the advertisement is used as a criterion in the logical tree in providing the appropriate advertisement."). Google's failure to construe non-selection renders its proposed construction vague and defective.

**T.   "User"**

Rockstar's position is straightforward. It is directly from the specification and comports with common sense. The user is the person operating "the data processing device." *Id.* 4:16-20. Indeed, the specification repeatedly refers to the "end user" as operating the device. *See*, *e.g.*, *id.* 4:36-38 ("an end user at device 12 accesses the advertising machine 10 as follows"); 6:1-2.

Google wishes to narrow the definition to someone operating a "computer." But the specification is not so limited. While "[e]xamples" of the "data processing device" "include a personal computer (PC) or Macintosh," the specification does not limit a data processing device simply to computers. *Id.* 4:1-2. The specification makes clear that "data processing device" includes "any conventional hardware/software combination supporting functionality for communications over the Internet." *Id.* 3:66-4:2.

### U.  "[Creating] User Preference Data"/ "Preference Data for the User"

Rockstar's construction—"[creating] data regarding a user's preferences"—stems from the plain language and the specification.  By contrast, Google's construction—"[creating] information about the user's preferences, not the user's search arguments"— attempts to build an exception to the term to exclude a user's search arguments.  Both the specification and the claims contradict Google's construction. The specification specifically discusses that "preferences . . . include[] all prior search data stored for that user." *Id.* 2:34-35; *see also* 2:54-55. And the claims specifically include "prior searching history" as a type of user preference data.  *See, e.g.*, '245 patent, claims 7, 24.

### V.  User Preference Input Terms

These terms, found in Appendix A, Section IV, are varying iterations of the term "user preference input," which Rockstar construes as "input from user regarding his or her preferences." This construction is faithful to the plain meaning of the term and supported by the specification. *See* '969 patent, 2:47-67. Google's proposed construction, which once again requires that the input is "not the user's search arguments," unjustifiably adds a limitation to the claims and excludes an embodiment as described *supra* at Part U. Because Google's construction would exclude this embodiment, it cannot be correct.

The additional user preference input terms in Appendix A, Section IV, include "user preference edit input," "user preference re-prioritization input," and "user specified preferences." Google's constructions add the "not the user's search arguments" limitation to these terms and, as such, should be rejected. Rockstar proposes that the words "edit," reprioritize," and

"specified" are in no need of construction because they are common English words with no technical meaning and can easily be understood by a layperson. Google, however, wants to include the limitation that these words imply additional input. This is improper. The specification teaches that a user can edit and re-prioritize his preferences without additional input. *See* '969 patent, 2:55-58 ("All preferences, for example, can be left in a type of default mode or even presented to the user for him/her to edit and re-prioritize in order to look for diversity or alternatives."). Moreover, nothing about the plain meaning of the words edit, reprioritize, or specify indicate that additional input would be needed. Rather, the user could simply edit, reprioritize, or specify information that has already been inputted.

### W. "[The] User Profile Data"

The only difference between these definitions is that Google wants to limit "profile data" to being stored at only one location—"<u>the</u> profile"—while Rockstar's definition makes clear that data may be stored in "<u>a</u> profile" and thus possibly in multiple places.  The specification does not limit the term to storing data in one location. The specification discusses that "user profile data may be maintained on end user device 12" or in a "user profile database" as part of the associative search engine on the network. '969 patent, 5:16-17; 5:62-63; 6:18-20; *see also* id. 1:58-65 ("searching for desired information within a data network" includes searching based on "user profile data"). And the specification provides that the associative search engine "can utilize the maintained profile on the end user." *Id.* 6:14-16. If data about the user is stored, it is user profile data—regardless of whether it is stored in multiple locations. An alternative and simpler definition to this phrase is "data maintained about the user," which captures the same point as above.

### X.  "Web Page Data Format"

With no specification support, Google tries to limit "web page data format" simply to HTML. The specification makes clear that the data processing device may be "any conventional hardware/software combination supporting functionality for communications over the Internet." *Id.* 3:66-4:2. HTML is but one example of accessing the Internet and a format for web page data.

Rockstar's definition—"format compatible for use on a web page"—is consistent with the claim language and the open-ended language of the specification.

## V.      TERMS REQUIRING NO CONSTRUCTION

The fourteen terms found in Appendix A, Section V, are plain English words and phrases that have "no elaborate" technical meaning and whose ordinary meanings are apparent. *Phillips*, 415 F.3d. at 1314. Google's approach is to take these plain English terms and apply narrow ill-fitting constructions in hopes of avoiding a finding of infringement. The Court need not construe these terms as requiring anything other than their plain and ordinary meanings. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims"); *see Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (holding that district court did not err in giving a term its "plain and ordinary meaning").

### A.  "Search Results" & "Modified Search Results" & "Sorting The Search Results"

The term "search result[s]" in the context of search engines is well known to anyone who has ever used the Internet. No degree in computer science is required to understand that search results are the results returned when one performs a search.  Nonetheless, Google construes this term as "a page of WWW site locations matching the search argument." This construction is bizarre because it limits the term to "a page" as opposed to multiple pages, "WWW site locations" as opposed to other types of locations such as FTP servers, and it must "match" the search argument—whatever that means. Google turns a simple term—understood by skilled and unskilled alike—into a confusing mess that conflicts with the term's plain and ordinary meaning. So, too, with "modified search results" and "sort[ing] the search results." Modified search results are simply that: search results that have been modified. Sorting means sorting, and is certainly not limited to "separating into groups" as Google contends. Indeed, Google's own dictionary reference indicates that sorting can also mean "ordering" and "arranging." *See* IBM Dictionary of Computing (10th ed. 1993) (Ex. 19).

### B.  "Included in a Webpage"

Google similarly applies a narrowing construction to "included in a webpage." Any English speaker understands these plain, nontechnical words and no "elaborate interpretation" is needed. Nonetheless, Google construes this as "included in a file or a document on the World Wide Web." Google's interpretation does nothing to clarify the claim language; will not help the jury understand this term; and excludes pages that are found on the Internet, but not the World Wide Web. *See* http://www.webopedia.com/DidYouKnow/Internet/Web_vs_Internet.asp

### C.  "Direct[ing] the Data Processing Device to a Website Corresponding to the Selection of the Advertisement"

Google claims that this term is limited to "the website of the advertiser or seller." Google's proposed addition is completely absent from the claim language. Rather, Google imports this limitation from the specification despite the plain and ordinary meaning of the phrase, which simply indicates that a user is directed to the website that corresponds to the advertisement—which may be the website of the advertiser or the seller, but also a third-party website. Moreover, Google's proposed construction requires "connect[ing] the data processing device to the website." This is wrong. The claimed action is not creating a connection between two computers, but rather making a website that has been clicked-on appear on the data processing device.

### D.  "Display[ing] in the [First/Second] Display Portion of a Display of the Data Processing Device"

So, too, with "display[ing] in the [first/second] display portion of a display of the data processing device," Google hopes to import the term "window" from the specification. Google does not attempt to construe a single word in this plain English phrase. Instead, Google transparently seeks to import a limitation—that the displays be separate windows—from the specification. Google's construction commits this "cardinal sin" of claim construction and should be rejected. Google's construction would also exclude the embodiment wherein the advertisement appears on the same page (i.e. window) as the search results. '969 patent, 4:29-32 ("an advertisement insert that is added to the end user's search page."). Finally, Google's construction of requiring separate windows would render the dependent claims nonsensical as

26

claim 5 of the '183 patent requires "the search results and the at least one advertisement are included in a web page," not separate web pages.

### E.  "Data Network Related Information"

The term "data network related information" is plainly information related to the data network. Google, however, attempts to force fit the limitation that it be "information from the data network being searched." Not only does Google's construction defy the plain meaning, it significantly limits the scope of the term by transforming information that is merely "related" to the data network into information that is "from" the data network.

### F.  "Subsequent Advertisement Selection Operations"

Google hopes to limit the plain language of "subsequent advertisement selection operations" in two nonsensical ways. First, Google limits the "operations" to "replacement"—nothing in the specification or claims indicates that the "operation" must be "replacement." Second, Google hopes to confine this term to operations "within a search session." Obviously, nothing in the claim language intimates this limitation is required, rather Google is attempting—as it dos so often—to import a limitation into the claim.

### G.  "Interacting" & "Updating" Terms

Google also attempts to force narrowing constructions of everyday words such as "interacting" and "updating." For the term "interacting with the advertising machine via the communications link to provide information used to create user profile data for the user," Google simply removes this term and replaces it with a cherry-picked definition to limit "interacting" to "acting upon each other." Google commits the same error with the terms "update[e|ing] the advertisement database based upon the [non-] selection of the advertisement"  and "updating advertisements provided to the data processing device based upon a determination that the user does not select the at least one advertisement." Google wants to rewrite the claim terms to recite "changing" rather than "updating." There is no cause for swapping one common English word for another. This is particularly true here because updating and changing are not synonyms. *See* Roget's 21st Century Thesaurus (3d ed. 2005) (Ex. 20). Moreover, with respect to the term

"updating advertisements provided to the data processing device based upon a determination that the user does not select the at least one advertisement," Google also attempts to import the word "database" so that the database is updated rather than the advertisements. But the claim term plainly does not call for a database.

### H.  Easily Understood Terms That Google Erroneously Claims Are Indefinite

Google asserts that, despite being composed of plain English words readily understood by any layperson, "distinct differing databases" is so indefinite that a reasonable construction could not be fathomed. No construction is needed because anyone reading it immediately realizes it means, simply, different databases. Likewise, Google argues that terms that are merely a combination of plain English terms and other separately construed terms are indefinite. For example, Google asserts that "used to [create user preference data] by the [advertising machine]" is indefinite. The more complete claim language is actually "provide user preference input used to create user preference data by the advertising machine." Google offers constructions for both bracketed terms, but is unable to reasonably ascertain what it means to create preference data from preference input. One of ordinary skill would have no such issue. So, too, with the term "the at least one [advertisement] obtained from at least one [database having advertisement information] based upon [the search argument] and [the user preference data]." Google claims this term is indefinite; however, this term plainly means that an advertisement is obtained from a database and the selection of that advertisement is based upon the search argument and the user preference data. In short, with each of the terms found in Appendix A, Section V, Google attempts to redefine or otherwise limit plain and ordinary terms that require no construction.

## VI.  <u>GOOGLE CANNOT SHOW TERMS ARE INDEFINITE FOR LACK OF ANTECEDENT BASIS</u>

Google claims that the terms in Appendix A, Section II, are indefinite on the ground they lack antecedent basis. Notably, with the exception of "associate search engine," Google does not claim that these terms are indefinite in the other claims in which they appear. Accordingly, Google's argument is that because these terms are preceded by the word "the," one of ordinary

skill could not determine the claims' scope with reasonable certainty. Google's position makes little sense.

Even when a claim term lacks explicit antecedent basis, "[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite." *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir.2001). Moreover, "antecedent basis can be present by implication." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (citations omitted). Google's indefiniteness arguments are meritless.

For instance, Google claims that "the associate search engine" of claim 26 of the '833 patent is indefinite for lack of antecedent basis despite the fact that claim 26 depends from claim 20 which recites an associative search engine. Google treats the person of ordinary skill as a mindless automaton. One of ordinary skill would recognize this typographical error as referring to the "associative search engine" and treat the claim term accordingly. Moreover, "a court can correct an obvious typographical error." *Ultimax Cement*, 587 F.3d at 1353. Google also errs with the term "the desired information" recited in claim 22 of the '969 patent. One of ordinary skill would have no trouble ascertaining that "the desired information" is the information that the user seeks. Moreover, the antecedent basis is present by implication. The received "search argument . . . correspond[s] to the desired information," indicating that desired information is the information sought by the user. One of ordinary skill would not be confused in the least by the presence of the word "the" preceding the term "desired information." Accordingly, this term is not indefinite. The foregoing arguments apply with equal force to the rest of the terms found in Appendix A, Section II.

## VII.    ORDERING DISPUTES

"As a general rule, [u]nless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one. However, a claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Mformation Techs, Inc. v. Research In Motion Ltd.*, __F.3d__, 2014 WL 4116459 (Fed. Cir.

Aug. 22, 2014) (citations omitted). Generally speaking, the asserted claims do not recite an order. Nonetheless, logic dictates—and the parties agree—that certain steps of the claims listed in the Joint Claim Construction and Pre-Hearing Statement Pursuant to Patent Rule 4-3 (Dkt. No. 121) at 2-4 must be performed in the order in which they are recited. Google, however, hopes to impose an order on certain claim elements found in Appendix A, Section VI, where no such order is recited or required by logic, grammar, or the specification.

For instance, Google claims that elements [b] and [c] of claim 17 of the '970 patent must be performed in order.  Not so.  First, no order is explicit.  Second, neither logic nor grammar indicates that these steps <u>must</u> be performed in order. Step [b] requires "searching at least one database using the search argument to produce search results" and step [c] requires "selecting at least one advertisement . . . based upon <u>*at least one of*</u> the search argument and the search results." While it is true that when the "advertisement" is selected based upon the "search results," logic dictates that the search results produced in step [b] must be generated prior to the selection of step [c], it is likewise true that when the "advertisement" is selected based solely upon the "search argument," nothing in grammar, logic, or the specification indicates that step [b] must be performed before step [c]. Accordingly, steps [b] and [c] need not be performed in order. This argument applies with equal force to the ordering disputes involving claims 26 and 40 of the '970 patent, claim 1 of the '183 patent, and both disputes regarding claim 1 of '178 patent. Google likewise attempts to force order onto steps [d]—displaying, [e]—receiving, and [f]—transmitting, of search refinement input in claim 12 of the '178 patent. Once again, no explicit order is recited by the claims. Moreover, nothing in logic or grammar indicates, and the specification certainly does not require, that step [d] involving "displaying" must occur prior to steps [e] and [f] which require "receiving" and "transmitting" "search refinement input." Accordingly, steps [d], [e], and [f] need not be performed in order.

DATED:  September 16, 2014          Respectfully submitted,


                                    By:   /s/ Max L. Tribble, Jr.
                                          Max L. Tribble, Jr. – Lead Counsel
                                          State Bar No. 20213950
                                          Alexander L. Kaplan, State Bar No. 24046185
                                          John P. Lahad, State Bar No. 24068095
                                          Shawn Blackburn, State Bar No. 24089989
                                          **SUSMAN GODFREY L.L.P.**
                                          1000 Louisiana Street, Suite 5100
                                          Houston, Texas 77002
                                          Telephone:  (713) 651-9366
                                          Facsimile:  (713) 654-6666
                                          mtribble@susmangodfrey.com
                                          akaplan@susmangodfrey.com
                                          jlahad@susmangodfrey.com
                                          sblackburn@susmangodfrey.com

                                          Justin A. Nelson, State Bar No. 24034766
                                          Parker C. Folse, III, WA State Bar No. 24895
                                          **SUSMAN GODFREY L.L.P.**
                                          1201 Third Ave, Suite 3800
                                          Seattle, Washington 98101
                                          Telephone: (206) 516-3880
                                          Facsimile:  (206) 516-3883
                                          jnelson@susmangodfrey.com
                                          pfolse@susmangodfrey.com

                                          Amanda K. Bonn, CA State Bar No. 270891
                                          Meng Xi, CA State Bar No. 280099
                                          **SUSMAN GODFREY L.L.P.**
                                          1901 Avenue of the Stars, Suite 950
                                          Los Angeles, CA 90067-6029
                                          Telephone: (310) 789-3100
                                          Facsimile: (310) 789-3150
                                          abonn@susmangodfrey.com
                                          mxi@susmangodfrey.com

                                          T. John Ward, Jr., State Bar No. 00794818
                                          Claire Abernathy Henry, State Bar No. 24053063
                                          **WARD & SMITH LAW FIRM**
                                          P.O. Box 1231
                                          Longview, TX  75606-1231
                                          Telephone: (903) 757-6400
                                          Facsimile:  (903) 757-2323
                                          jw@wsfirm.com
                                          claire@wsfirm.com

S. Calvin Capshaw, State Bar No. 03783900
Elizabeth L. DeRieux, State Bar No. 05770585
D. Jeffrey Rambin, State Bar No. 00791478
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX  75647
Telephone: (903) 236-9800
Facsimile:  (903) 236-8787
ccapshaw@capshawlaw.com
ederieux@capshawlaw.com
jrambin@capshawlaw.com

***Attorneys for Rockstar Consortium US LP and***

***NetStar Technologies LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served this 16th day of September, 2014 with a copy of this document via the Court's CM/ECF system per Local Rule CD-5(a)(3).

/s/ Max L. Tribble, Jr.
Max L. Tribble, Jr.
